Thomas MARVELLI, M.D., Appellant,

v.

Minnie ALSTON, Appellee.

No. 2–00–278–CV.

Court of Appeals of Texas,
Fort Worth.

Jan. 23, 2003.

Rehearing Overruled April 10, 2003.

462

Wallach Andrews Florshiem, D. Michael Wallach, J. Wade Birdwell, Fort Worth, for Appellant.

Jose, Henry, Brantley & Keltner, David E. Keltner, Fort Worth, Miller & Curtis, LLP, Charles Clayton Miller, Heygood, Orr & Reyes, LLP, Lorin M. Subar, Dallas, for Appellee.

PANEL B: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

## OPINION

ANNE GARDNER, Justice.

### I. INTRODUCTION

Appellant Dr. Thomas Marvelli appeals from a judgment rendered on a jury verdict awarding damages to Appellee Minnie Alston for the loss of her right eye following multiple lens implantation surgeries. In his first three issues, Dr. Marvelli contends that the opinions of Alston's medical

expert witness as to causation were of no probative value because they were (1) based upon assumptions of fact contrary to the evidence; (2) scientifically unreliable as *ipse dixit* testimony; and (3) based upon an improper "loss of chance" theory not recognized by Texas law, resulting in legally and factually insufficient evidence that the loss of Alston's right eye was proximately caused by Dr. Marvelli's negligence. Dr. Marvelli's fourth issue alternatively maintains that admission of Alston's expert's opinions over objection was an abuse of discretion and harmful error requiring a new trial. In Dr. Marvelli's fifth, sixth, seventh, and eighth issues, he asserts that the trial court erred in excluding testimony of witnesses who were allegedly intimidated and concealed by Alston during trial, and who were discovered only after trial to possess knowledge of her contributory negligence. Dr. Marvelli's ninth issue complains that the evidence is legally and factually insufficient to support Alston's award for future damages. We affirm.

## II. FACTUAL & PROCEDURAL HISTORY

In 1978, Minnie Alston had cataract surgery resulting in removal of her natural lenses from both eyes, compromising her peripheral vision and requiring her to wear thick-lensed glasses that distorted her perception. Alston's cataract surgery included a peripheral iridectomy, consisting of removal of a small segment from the outer edge of her left iris. The surgery on her right eye required a sector iridectomy, consisting of removal of a larger U-shaped section of her iris extending vertically from the edge of the iris to the pupil and horizontally, as if looking at the face of a clock, from approximately the 11:00 to the 1:00 o'clock position.

Lens implantation contemporaneous with cataract surgery was not available when Alston's surgery was performed. Alston contacted Dr. Marvelli in April of 1996, at age 59, seeking secondary implantation of intraocular lenses in both of her eyes. "Secondary" refers to implantation performed subsequent to earlier cataract surgery. If successfully implanted, the lenses would improve Alston's vision and free her from the need for cataract spectacles or contacts.

Dr. Marvelli is a board certified ophthalmologist specializing in lens implant procedures and has maintained a large practice in Fort Worth, Texas for fifteen years, performing 100 to 200 surgeries per week. Dr. Marvelli discussed the implant procedure with Alston, including the risks of blindness and the loss of her eye, and offered her the alternative options of contact lenses or a new prescription for glasses. Alston chose the implant surgery.

On May 6, 1996, Dr. Marvelli performed a secondary anterior chamber intraocular lens implantation procedure on Alston's right eye. "Anterior chamber" means placement of the lens implant in front of the iris. Dr. Marvelli's surgical technique consisted of making a "superior" incision, that is, at the top of the eye, inserting a multiflex lens, and rotating the lens so that "haptics," S-shaped loops at the top and bottom of the lens, were positioned on the sclera spur of the iris between the 1:00 and 2:00 o'clock and 7:00 and 8:00 o'clock positions. The haptics are intended to be anchored by fibrosis or scarring into the sclera over solid iris.

Dr. Marvelli performed the same procedure on Alston's left eye in August of 1996. Alston had no complaints or complications with the lens implant in her left eye. The quality of her vision improved. She had no complications with the implant in the right eye for over six months, from May

until December of 1996. Alston recalled Dr. Marvelli's post-surgical instructions on each occasion to wear a metal shield over the affected eye for six weeks and not to rub the eyes at any time, along with his warning of what could happen, which he demonstrated by turning the lights off.

On December 6, 1996, Alston complained to Dr. Marvelli that she awoke that morning with double vision and irritation in her right eye. Dr. Marvelli noted redness, tearing, and that her eyes were bloodshot and irritated, indicating that she had been rubbing them. Dr. Marvelli later said that she admitted rubbing them. The lens in the right eye was tilted, hanging behind the iris. He performed surgery the following day, finding that the implant had been pushed through the sector iridectomy and behind the iris. The tissue of the iris was ripped and torn. He removed the dislocated lens and replaced it with another lens.

In replacing the lens in the second surgery, Dr. Marvelli followed the same placement procedure as in the initial implantation. He emphasized she must leave the eye alone. For the next five months, Alston had a good result; however, in April of 1997, she presented with an onset of acute deterioration of her vision in the right eye and told Dr. Marvelli she had fallen out of bed and had struck her right eye. Dr. Marvelli determined that the lens in the right eye had dislocated again and had fallen through the hole in her iris tearing a section of the iris as it fell through.

Dr. Marvelli's handwritten notes reflected that Alston was continuing to rub her eyes. He saw Alston rubbing her eyes while in his office. Additionally, by December of 1996, Dr. Marvelli concluded that Alston's drinking was a problem, her smoking was indirectly contributing to the irritation of her eye, and she was a "noncompliant patient." Alston admitted she drank anywhere from two to six beers on a daily basis and had been a smoker for 50 years although she had pulmonary disease and a stent implanted in an artery.

Because the lens had fallen through the sector iridectomy a second time, Dr. Marvelli decided to remove the implant and sew the iris together to reduce the chance of another dislocation. He performed the third surgery to remove the implant and sutured the iridectomy shut on May 6, 1997. By August of 1997, Alston's right eye had improved, and Dr. Marvelli performed another lens implantation, making a wider incision with fresh tissue and removing scar tissue to promote healing. He followed the same lens placement procedure as on the previous occasions.

After the fourth surgery, Dr. Marvelli found increased visual acuity in the right eye and that the incision was healing nicely. Alston's vision was comparable to that before her second surgery. However, by the time of her visit to him on October 2, 1997, Alston's vision had deteriorated considerably and she reported watering and pain upon touching the eye. Although the lens was in place, her visual acuity was limited to perception of hand movements, and her right eye pressure was substantially below normal, with corneal swelling.

Despite the low pressure, Dr. Marvelli saw no wound leak or epithelial downgrowth.[1] Epithelial downgrowth occurs when skin cells covering the outer portion of the eye grow through a wound into the interior of the eye. The cells can grow all over the entire eye, including the surface of the cornea, can cause glaucoma, and can

---

1. Dr. Norman Jaffe, plaintiff's expert witness, testified that, based upon his understanding of Dr. Marvelli's deposition testimony, Dr. Marvelli had neither seen nor tested for a wound leak or epithelial downgrowth.

destroy the eye. He prescribed steroid drops to reduce corneal swelling.

On October 16, 1997, Alston returned to Dr. Marvelli for the last time. Dr. Marvelli described her visual acuity in the right eye as legally blind. Her right eyelid drooped, and she had inflammation. He saw no wound leak and her ocular pressure was back up to normal, but he determined that the cornea in the right eye was dying.

Alston consulted another ophthalmologist, Dr. Edward Augustat. Dr. Augustat determined that the pressure was within normal limits in both eyes. Upon examination, he also saw no wound leak.[2] Dr. Augustat referred Alston to Dr. Keith Fisher, a retinal specialist, who found that the sutures used to sew the sector iridectomy together were coming loose and the eye was losing pressure. He, in turn, referred Alston to a glaucoma specialist, Dr. Stephen Goode, who noted that the anterior chamber was closing down, and the iris and cornea were scarring together with swelling in the back of the eye. Dr. Goode diagnosed Alston as having a wound leak with epithelial downgrowth.

Dr. Goode referred Alston to Dr. Robert Wayne Bowman, an ophthalmologist in Dallas. Dr. Bowman attempted to save Alston's eye by gluing a contact lens to the surface of her eye to seal the wound. Two days later the lens came unglued. After a second attempt to glue the contact lens was unsuccessful, he attempted other procedures, including a corneal transplant, which also failed. Finally, he removed the iris and froze the eye in an effort to remove residual epithelial cells. Because of the wound leak, Alston's eye continued to lose pressure, began to collapse, and ultimately died. On January 9, 1999, Alston

underwent surgery to remove her eye, which was replaced by a prosthetic eyeball.

Alston filed suit against Dr. Marvelli, claiming negligence and gross negligence. Her expert, Dr. Norman Jaffe, testified by video deposition at trial that Dr. Marvelli breached the standard of care by inserting the implants from the top or "superior" position, not positioning them horizontally at the 3:00 and 9:00 o'clock position, and operating through the same incision on four separate occasions In his opinion, placement of the implants over or near the sector iridectomy increased the chance of dislocation. With horizontal placement, dislocation of the implants in the first and second surgeries would have been extremely unlikely and would have prevented the necessity of the multiple surgeries. In his opinion, operating through the same incision on all four surgeries also contributed to the loss of the eye. As a result, Dr. Jaffe said, the wound leak developed, allowing the epithelial downgrowth to invade, which caused the loss of the eye.

The jury found the negligence of both Dr. Marvelli and Alston was a proximate cause of the loss of Alston's eye, with Dr. Marvelli 75% responsible and Alston 25% responsible for the loss of her eye. The jury found $100,000 for past damages and $850,000 for future damages. The trial court's judgment on the verdict for Alston totaled $731,794.95.

## III. DISCUSSION
### A. Legal and Factual Sufficiency of the Evidence

Dr. Marvelli's first three issues complain that the evidence is legally and/or factually insufficient to support a causal relationship between Dr. Marvelli's care and the loss of

**2.** Dr. Jaffe also testified that, based on his review of Dr. Augustat's notes, Dr. Augustat neither recorded nor tested for a wound leak.

Alston's right eye. Those issues depend upon whether the opinion testimony of Dr. Jaffe, is probative evidence of causation. Dr. Marvelli contends that Dr. Jaffe's testimony constitutes no evidence because: (1) his testimony was based on assumed facts that materially varied from the actual facts in question; (2) his testimony was solely comprised of his *ipse dixit* opinion; and (3) his testimony was impermissibly based on the "loss of chance" doctrine not recognized in Texas. Alternatively, Dr. Marvelli complains in his fourth issue that the trial court abused its discretion by admitting Dr. Jaffe's testimony.

### 1. Legal Sufficiency

 In determining a no-evidence issue, we review only the evidence and inferences that tend to support the finding, in the light most favorable to the verdict, and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez,* 937 S.W.2d at 450; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

 A no-evidence issue may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). There is some evidence when the proof supplies a reasonable basis on which rea-

sonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

### 2. Factual Sufficiency

 An assertion that the evidence is factually insufficient to support a finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Duncan Land & Exploration, Inc. v. Littlepage,* 984 S.W.2d 318, 325 (Tex.App.-Fort Worth 1998, pet. denied). We are required to consider all of the evidence in the case in making this determination. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

### B. Medical Malpractice Causation

 Plaintiffs in medical malpractice cases are required to prove that their injuries were proximately caused by the negligence of the defendant. *Park Place Hosp. v. Estate of Milo,* 909 S.W.2d 508, 511 (Tex.1995); *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988). To establish proximate cause, the plaintiff must prove: (1) foreseeability, and (2) cause-in-fact. *Leitch v. Hornsby,* 935 S.W.2d 114, 118–19 (Tex. 1996); *Arlington Mem'l Hosp. Found., Inc. v. Baird,* 991 S.W.2d 918, 922 (Tex. App.-Fort Worth 1999, pet. denied). The ultimate standard of proof on the causation issue is "whether, by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the [injury] and without which the harm would not have occurred." *Park Place Hosp.,* 909 S.W.2d at 511 (quoting *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 400 (Tex.1993)).

With regard to cause-in-fact, the plaintiff must establish a causal connection between the defendant's negligence and the injuries based upon a "reasonable medical probability," and not mere conjecture, speculation, or possibility. *Park Place Hosp.*, 909 S.W.2d at 511; *Lenger v. Physician's Gen. Hosp.*, 455 S.W.2d 703, 706 (Tex.1970); *Baird*, 991 S.W.2d at 922. A plaintiff, however, "is not required to establish causation in terms of medical certainty nor is he . . . required to exclude every other reasonable hypothesis." *Bradley v. Rogers*, 879 S.W.2d 947, 953–54 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Whether expert testimony on causal connection rests upon reasonable medical probability must be determined by the substance and context of the testimony rather than semantics or use of a particular term or phrase. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex.1995); *Baird*, 991 S.W.2d at 922.

The trier of fact may decide the issue of proximate cause in medical malpractice cases based upon: (1) general experience and common sense from which reasonable persons can determine causation; (2) scientific principles provided by expert testimony allowing the fact finder to establish a traceable chain of causation from the condition back to the event; or (3) a probable causal relationship as articulated by expert testimony. *Parker v. Em-ployers Mut. Liab. Ins. Co. of Wis.*, 440 S.W.2d 43, 46 (Tex.1969); *see also Lenger*, 455 S.W.2d at 706.

## C. The Evidence

Prior to trial, the trial court conducted a hearing on and overruled each of Dr. Marvelli's objections to Dr. Jaffe's expert opinion testimony. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 591 (Tex.1999); *Mar. Overseas Corp.*, 971 S.W.2d at 402 (requiring objection before or at time expert testimony is offered to preserve reliability complaint, both for admissibility and legal sufficiency as evidence of scientific evidence).[3]

The procedures performed by Dr. Marvelli were clearly not matters of common knowledge or within the experience of laymen. Therefore, expert medical testimony based on reasonable probability was required to establish either a "traceable chain of causation" based upon general scientific principles or a "probable causal relationship" between Dr. Marvelli's surgical technique and Alston's injuries. *Baird*, 991 S.W.2d at 922; *Bradley*, 879 S.W.2d at 953–54. Specifically, Alston's burden was to establish through expert testimony that there was a reasonable medical probability that Dr. Marvelli's alleged negligence in performing the implantation procedures was a substantial factor in bringing about the loss of her eye and without which the harm would not have occurred.

---

**3.** We reject Alston's contention that Dr. Marvelli waived error. Each complaint was raised and ruled upon in the pre-trial hearing. Therefore, it is unnecessary to determine whether both the reliability and the "no-evidence" complaints must have been preserved by objections before trial or at the time the evidence was offered. *Compare Gen. Motors Corp. v. Harper*, 61 S.W.3d 118, 129 (Tex. App.-Eastland 2001, pet. filed) (holding *Sanchez* and *Mar. Overseas Corp.* not applicable to require no-evidence complaint as to scientific evidence not related to reliability) *and Cruz v. Paso Del Norte Health Found.*, 44 S.W.3d 622, 631–32 (Tex.App.-El Paso 2001, pet. denied) (holding attack on opinions of experts because premised on unsupported, assumed facts not a question of reliability) (discussing *Mar. Overseas Corp.*, 971 S.W.2d at 418 (Hecht, J., dissenting)), *with Weiss v. Mech. Assoc. Servs., Inc.*, 989 S.W.2d 120, 125 (Tex. App.-San Antonio 1999, pet. denied) (considering "no-evidence" complaint to expert opinion as merely possibility, surmise, or speculation under *Robinson* and *Havner* factors).

Alston's expert witness as to causation, Dr. Jaffe, is an ophthalmologist specializing in cataract and lens implant surgery in Miami, Florida since 1947. Dr. Jaffe testified by deposition, based on his review of Dr. Marvelli's deposition and medical records and the medical records of Alston's subsequent treating physicians. At the conclusion of Dr. Jaffe's direct examination, he summarized his opinions as follows:

Q: If Minnie Alston had her lens implanted the way you have shown under the safe method, meaning horizontally, do you have an opinion, based upon reasonable medical probability, as to whether or not Minnie Alston would still have her vision today in that right eye.

A: I think so.

Q: Would she still have her eyeball today in that right eye?

A: She would have her eyeball, and I think she probably would have had good vision. I don't think there would have been a second operation.

Dr. Jaffe testified, first, that the standard of care for an anterior lens implant with a sector iridectomy required using the side or "temporal" approach. In Dr. Jaffe's opinion, the "event" that set in motion the chain of events that caused the loss of Alston's eye was Dr. Marvelli's approach by entering from the superior position in the first surgery. That approach was beneath the standard of care and increased the likelihood of dislocation of the lens.

In Dr. Jaffe's opinion, Dr. Marvelli also breached the standard of care by placing the haptic over or near the iridectomy opening. If the lens had been placed horizontally, Dr. Jaffe said, the lens would have been over solid iris and, in reasonable medical probability, would not have dislocated in either the first or the second

surgery. In his opinion, if the first implant had been inserted temporally and positioned horizontally, it was extremely unlikely that the events that followed would have occurred.

Placing the lens as Dr. Jaffe assumed Dr. Marvelli did, over the iridectomy or even nearby, Dr. Jaffe said, "set up Minnie Alston for complication[s]" such as dislocation as a consequence of rubbing her eye. In fact, Dr. Jaffe testified that based upon his review of Alston's medical records, Alston did nothing wrong, such as rubbing her eye, to cause the dislocation. The haptic could have dislocated without trauma; it could "find its way" to the opening by a hard cough or from squeezing or blinking her eye. In Dr. Jaffe's opinion, Dr. Marvelli's positioning of the implant increased the likelihood of a dislocation, which is what happened in the first operation.

Dr. Jaffe further criticized Dr. Marvelli's technique, based on his assumption that Dr. Marvelli entered at the same incision site on four surgeries, which, in his opinion, was a "contributory factor" to the epithelial downgrowth. It would have been better, he said, to use a new incision each time. Going through the same incision site created an unstable wound that would leak on and off and allowed complications to develop. Alston could have then created the wound leak from the unstable wound by trauma or, for instance, just a wrong step on a stairway. The wound leak, in his opinion, allowed the epithelial downgrowth to develop.

Dr. Jaffe acknowledged on cross-examination that Alston had a good medical result after her first surgery until December 1996. He agreed it was possible that rubbing could cause a dislocation of a lens implant. He also agreed that she had a good result from the second surgery until

she had her second acute deterioration of vision. With the type of implant she had and its location, he agreed she could have dislocated her own implant by rubbing or striking her eye as she reported. In October of 1997, the decrease in vision and significant inflammation that she had could also have been caused by rubbing. He agreed a wound that is closed can be re-opened by a trauma like rubbing or striking the eye.

Dr. Jaffe also conceded on cross-examination that it would be unlikely that a lens inserted as Dr. Marvelli described—superiorly, and then rotated to a position between 1:00 to 2:00 o'clock and 7:00 to 8:00 o'clock—would rotate in the ordinary course of a person's affairs. Without interference or other manipulation, there would ordinarily be some fibrosis after two weeks to ninety days.

Dr. Marvelli testified he performed the initial implant in May 1996 by making the incision at the "superior" or top position, sliding the lens implant in with a sheets glide and rotating it to between the 1:00 to 2:00 o'clock and 7:00 to 8:00 o'clock positions. He was taught the superior approach in his training at L.S.U. He considered placing the implant at the 3:00 and 9:00 o'clock position, horizontally, but did not do so for other reasons, primarily for "astigmatism control," because the wound is the weakest location, and because of the risk of "UGH" syndrome.[4]

Dr. Marvelli testified that the sector iridectomy was a serious consideration in performing implant surgery on Alston's right eye, with a possibility of dislocation if any part of the foot piece or haptic of the lens was over the iridectomy opening. His purpose in the surgery was to get the haptic over solid iris and resting on the

sclera spur to prevent dislocation. He agreed that the upper haptic of the implant should be over solid iris to prevent dislocation. He further agreed that, if any part of the loop of the haptic was over the opening of the iridectomy it would be below the standard of care and negligent. In performing Alston's right eye implant, Dr. Marvelli testified, he placed the haptic over solid iris.

In Dr. Marvelli's opinion, Alston's rubbing of her eyes contributed to the dislocation in December of 1996, as shown by the eye's irritation, redness, tearing, and visual changes. He testified that, if there is trauma, there is risk of dislocation, no matter where the implant is positioned. Out of hundreds of implants, Alston is the only patient he had seen with a dislocation of an implant.

At seven months after the first implant procedure, the haptics should have been scarred into the iris by fibrous growth. When he removed the first implant in December 1996, Dr. Marvelli noted that it had scarred in as it should have, and that it had been pushed through the pupil and was hanging, that it was not a rotational problem, and it did not just fall through the pupil. The tissue was ripped and torn and traumatized. In his opinion, Alston's rubbing had dislocated it.

The following April, when Alston reported that she had fallen out of bed morning and struck her eye, the iris was again ripped and torn; it was not just a dislocation. Dr. Marvelli removed the second implant and sewed up the iridectomy in May 1997. A month later, in June, Alston reported a sudden onset of pain, and Dr. Marvelli believed she was rubbing her eyes again. The eye was being

---

4. Dr. Marvelli testified that the "UGH" syndrome consists of "uveitis, glaucoma and

hyphema" caused by irritation of the iris.

abused, in his opinion. An iris is not torn, he said, without trauma. Again, in July, he attributed Alston's acute onset of pain and sudden swelling of the cornea with inflammation to trauma. By August of 1997, Alston's eye had improved enough to place another implant.

Concerned that her cornea might break down from repeated trauma, Dr. Marvelli nevertheless felt that another implant was Alston's only option to recover her vision. In performing the fourth surgery in August 1997, Dr. Marvelli widened the old incision with fresh tissue to promote healing, placing the new lens in the same position as before. After the last implant, he said, the lens stayed in position. At that point, the iridectomy had been sutured shut. However, by October 1997, the cornea was decompensating. He did not think the eye was going to survive.

In Dr. Marvelli's opinion, placing the lens horizontally would not have protected the eye from rubbing or trauma sufficient to disrupt the scarring-in of the haptics and to dislodge the lens and push it through the pupil. Once pushed and rotated, the lens would be free-floating and would keep on going, no matter where it had been placed. In his opinion, his treatment and care of Alston was not negligent or the cause of the loss of Alston's eye. The cause of the loss of Alston's eye, he testified, was the epithelial downgrowth, which resulted from repeated trauma to her eye that was clearly progressive.

Dr. Robert Wayne Bowman, Associate Professor of Ophthalmology at the University of Texas Southwestern Medical Center for fourteen years, as well as a clinical practitioner, testified the lens was in place when Alston came to him on November 17, 1997. He diagnosed hypotony or low pressure, in the right eye, and a wound leak located at what looked like the site of a surgical incision. He performed several procedures to attempt to save Alston's eye from the epithelial downgrowth, which was brought on by the wound leak. In his opinion, the loss of the eye was caused by the wound leak.

Dr. Bowman testified that options with a sector iridectomy are to suture it shut or to let the lens rest on the sclera spur, as he said Dr. Marvelli first attempted. Typically, he said, a lens would be inserted from the side and oriented horizontally at the 3:00 and 9:00 o'clock position, but Dr. Bowman was aware of surgeons who routinely insert the lens from the superior position as was done by Dr. Marvelli. In his opinion, use of the superior, rather than the horizontal approach is a matter of "personal preference." Just because a lens is inserted from a superior rather than a horizontal location is not outside the standard of care, he said. However, he personally does not rotate it to between the 1:00 to 2:00 and 7:00 to 8:00 o'clock positions if that is where the sector iridectomy is because he would worry about dislocation.

As to causation of the wound leak, all that Dr. Bowman could say was that at some point the incision separated, and every ophthalmologist will occasionally have an experience where they thought the wound was closed and it would subsequently open up. He agreed that rubbing is the worst thing the patient can do because rubbing could disrupt a wound site and open it up, allowing entrance for an epithelial downgrowth. Rubbing can also dislocate the implant, he said, causing the lens to rotate. Dr. Bowman, in accord with Dr. Jaffe's testimony, also opined that if a lens is inserted and oriented horizontally at the 3:00 and 9:00 o'clock position, more likely than not, rubbing would not cause the haptics to get caught in the iridectomy and dislocate.

In Dr. Bowman's opinion, the epithelial downgrowth could have developed in as little as five days. It can grow up to one millimeter per day, and Alston's was five millimeters in length. In his opinion, "something changed" between the time of her last visit in October 1997 to Dr. Marvelli, when her ocular pressure was normal, and November 1997, when he saw her.

Defendant's expert witness, Dr. James Key, has been a practicing ophthalmologist for 24 years, and is Chief of Ophthalmological Services at St. Luke's Hospital in Houston, is a full professor at Baylor College of Medicine in Houston, has authored a textbook on ophthalmology, and has published numerous articles in peer review journals, none, however, on cataract and lens implantation surgeries. Dr. Key testified that he always uses the superior approach, as performed by Dr. Marvelli, on surgeries similar to Alston's with a patient who has a sector iridectomy. The superior approach is still the one that is used the most and is the one he teaches in the residency program at Baylor. In his opinion, Dr. Marvelli's use of the superior approach was reasonable and within the standard of care.

Dr. Key testified that most of the secondary implants with sector iridectomies he has seen, while rare today, are positioned at an oblique angle, generally at the 2:00 and 8:00 o'clock position. Dr. Key further testified that, in his hands, the most reasonable placement for Alston's lens implant was at the 3:00 and 9:00 o'clock position. Although his personal preference is the horizontal position, and that is what he advises his residents to do to, his opinion was that rotation to the 1:00 to 2:00 o'clock and 7:00 to 8:00 o'clock position by Dr. Marvelli was within the standard of care.

After four or five months, Dr. Key said, the haptics are held in place by scarring and are difficult to move. As long as the haptic was placed over solid iris, it should not dislocate, in his opinion, absent external trauma. Even if part of the implant was over the sector opening, it should not have dislocated, absent trauma. The most likely cause for anterior chamber dislocations, in his opinion, is trauma. Rubbing of her eye by Alson would most likely be the trauma causing her dislocation, consistent with her history.

As to the incisions, Dr. Key assumed that Dr. Marvelli came in behind the first incision for the second implant. He agreed the records showed that Dr. Marvelli came in through the same wound on the third surgery. It would have been difficult to go through the same incision even if he tried, but widening the incision and going into fresh tissue would promote healing. Dr. Key would not recommend operating through the same incision four times. Based on Dr. Key's review of the medical records, however, in his opinion, Dr. Marvelli was not negligent, and his operations and follow-up care were not the proximate cause of the loss of Alston's eye.

### D. Application of Law to Testimony

#### 1. Standards Applicable to Expert Opinion Evidence

Before a witness may testify as an expert about scientific, technical, or other specialized matters, the witness must be qualified as an expert. *United Blood Servs. v. Longoria,* 938 S.W.2d 29, 31 (Tex. 1997). Whether a witness is sufficiently knowledgeable to be considered an expert is preliminarily a question for the trial court. *Id.; see* Tex.R. Evid. 104(a). Additionally, the qualifications of the expert must be measured against the particular opinions offered. *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996); *see also* Tex. Rev.Civ. Stat. Ann. art. 4590i, § 14.01(a)

(Vernon Supp.2003) (listing qualifications required for medical malpractice experts).

██ The proponent of expert testimony must also show that the opinions are both relevant to the issues and based upon a reliable foundation. TEX.R. EVID. 702; *Guadalupe–Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex.2002); *E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 553 (Tex.1995) (adopting analysis of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993)). The trial court must make the threshold determination of whether the testimony meets both the relevancy and reliability standards for admissibility under Rule 702. *Robinson*, 923 S.W.2d at 557. The supreme court has set forth six non-exclusive factors to aid courts in determining whether scientific testimony is reliable:

> (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique.

*Id.* (citation omitted); *see also Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex.1998) (stating that the *Robinson* factors are not always appropriate for assessing the reliability of certain kinds of expert testimony).

██ A party may complain of admission or exclusion of expert testimony on relevancy or reliability grounds based on an abuse of the trial court's discretion. *Robinson*, 923 S.W.2d at 558. Complaint may also be made that expert testimony not based upon a reliable foundation is legally insufficient evidence to support a judgment. *Mar. Overseas Corp.*, 971 S.W.2d at 409 (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)). "If the expert's scientific testimony is not reliable, it is not evidence." *Havner*, 953 S.W.2d at 711. To constitute legally sufficient evidence of causation, the expert's assertion of validity is not enough; the underlying data and methodology of the expert must be independently examined. *Id.* at 714. Reliability must be determined from all of the evidence. *Id.* at 720 (holding court should determine from a totality of the evidence, considering all factors affecting reliability, whether there is legally sufficient evidence to support a judgment).

### a. Assumed Facts Not Supported by Evidence

Dr. Marvelli contends, first, that Dr. Jaffe's opinions constitute "no evidence" because they were based on assumed facts that varied materially from the actual evidence, so that they are without probative value and cannot support a verdict or judgment, relying upon *Crye*, 907 S.W.2d at 499 (holding expert opinions based upon assumed facts contrary to undisputed evidence constituted no evidence), and *Schaefer v. Texas Employers' Ins. Ass'n*, 612 S.W.2d 199, 202–05 (Tex.1980) (holding expert opinion based on assumed facts supported by no evidence constituted mere speculation, suspicion, and surmise).

██ Specifically, Dr. Marvelli first complains that Dr. Jaffe premised his opinions as to the insertion and placement of the lenses on an incorrect assumption that Dr. Marvelli placed the haptics at the vertical or 12:00 and 6:00 o'clock position. Dr. Marvelli argues that his own testimony that he rotated the haptics to between 1:00

to 2:00 o'clock and 7:00 to 8:00 o'clock is contrary to Dr. Jaffe's assumption. However, Dr. Jaffe testified that he "accepted" Dr. Marvelli's testimony that he rotated the haptics as he said he did. Nevertheless, Dr. Jaffe consistently maintained that, regardless of whether they were placed vertically or where Dr. Marvelli testified he rotated them, the haptics should have been placed horizontally at 3:00 and 9:00 o'clock. We cannot agree that Dr. Jaffe's opinions as to placement of the haptics were based on assumptions that varied materially from the evidence.

■ Dr. Marvelli also contends that Dr. Jaffe incorrectly assumed that he placed the upper haptic over the iridectomy opening. Dr. Marvelli points out that he denied placing the haptic over the opening and consistently testified that he placed it on solid iris. However, we note that Dr. Marvelli also acknowledged that his drawing of the right eye with the sector iridectomy located at the 11:00 to the 1:00 o'clock position was only an approximation. If the iridectomy opening extended that far, he admitted, then part of the haptic would have been located over the opening of the iridectomy. Dr. Marvelli acknowledged in his testimony that, given his estimated size of the iridectomy opening, based on "pure mathematics," part of the haptic would have been over the opening even at 1:00 o'clock. We also note that Dr. Jaffe testified that if the haptic was even near or "a little bit adjacent to" the opening, it would "find its way" into the opening. Therefore, we do not see that Dr. Jaffe's opinions were necessarily based on an assumption of fact contrary to the evidence.

■ As to Dr. Jaffe's assumption that Dr. Marvelli used the same incision site for all four surgeries, Dr. Marvelli points to his own testimony that he entered at a slightly different location on the second

surgery and slightly behind the old incision on the third, and that, although he entered at the site of the old incision on the fourth surgery, he widened it with fresh tissue in order to promote healing. However, the record reveals that Dr. Marvelli, himself, also testified and his records reflected that he entered at the original or old "wound" site in the second, third, and fourth surgeries. This was some evidence, despite Dr. Marvelli's other testimony to the contrary, to support Dr. Jaffe's assumption on which his opinions were based.

■ Dr. Marvelli devotes considerable space to arguing that Dr. Jaffe incorrectly assumed the existence of a wound leak before Alston ended her relationship with Dr. Marvelli, when there was no such evidence. While Dr. Jaffe stated on cross-examination, "I assume she had a wound leak before she saw Dr. Augustat," Dr. Jaffe based this opinion regarding the timing of the development of the wound leak on the progression of symptoms documented by the medical records of Alston's treating physicians, not on assumptions. Dr. Jaffe testified that because Dr. Marvelli went through the same incision multiple times, the following complication arose:

> I think she was having intermittent leakage of the incision, a poorly [k]nit together incision, allowing things outside of the eye to enter the inside of the eye, things on the outside which do not belong inside the eye and create ultimate damage to the internal structures of the eye.

Dr. Jaffe also testified that he found other objective signs of a wound leak in Dr. Marvelli's records:

Q: Do you have an opinion whether or not in October of 1997, when Minnie saw Dr. Marvelli, she had a wound leak at that time?

A: I do.

Q: Could you tell us what that opinion is?

A: Well, there were two visits in October, as you recall; one, said that the pressure was between two and four; and then the next one says it's up to, I believe, 13.

You don't go from two to four to 13 from one visit to the next. There had to be a wound leak, at least a wound leak on the visit subsequent to the last one—before the last one, and there was evidence of it. There was folds in Descemet's membrane and other symptoms that the patient had.

Furthermore, Dr. Jaffe testified that such a wound could open up microscopically and seal itself, leaking intermittently, which would explain why testing would reveal "different pressures on different days." Dr. Jaffe opined that, in spite of Alston's pressure being in the normal range on the day she visited Dr. Augustat, she had a wound leak "because [Dr. Augustat] saw something inside the eye ... a retrolenticular mass ... that didn't belong in that location," a condition "[t]hat will occur in an eye that has suffered a wound leak." [5]

In *Crye*, relied upon by Dr. Marvelli, the expert medical witness based his opinion that uses of Polysporin TM spray caused a frostbite injury on an assumed fact that the plaintiff's foot turned white after its application, and admitted that his conclusion as to causation would be different if the foot had turned red. 907 S.W.2d at 499. Because the evidence was undisputed, from the plaintiff's admission in her deposition and from her husband's testimony that her foot turned red after application of the spray, the supreme court held that the opinion was no evidence of causation, stating:

When an expert's opinion is based on assumed facts that vary materially from the actual undisputed facts, the opinion is without probative value and cannot support a verdict or judgment. *See Schaefer* [, 612 S.W.2d at 202–05].

*Id.*

In *Schaefer*, it was likewise not disputed that the plaintiff's disease was caused by a bacteria, some serotypes of which were pathogenic to birds. 612 S.W.2d at 200. The plaintiff's expert testified that the plaintiff contacted his disease while working in soil containing bird feces. *Id.* at 204. However, there was no evidence that the bacteria causing plaintiff's disease was in the soil where he had worked. *Id.* at 202. Moreover, no testing had been done to determine whether the plaintiff suffered from an avian strain of the disease. *Id.* at 201. Absent such proof, the supreme court held that the expert's testimony was not probative evidence but was mere speculation, possibility, and surmise. *Id.* at 204.

*Crye* is distinguishable because we do not find undisputed material evidence contrary to Dr. Jaffe's assumptions. Unlike the expert's opinions in *Schaefer*, Dr. Jaffe's opinions were not based upon assumptions totally unsupported by evidence. The record here reflects conflicts in testimony regarding the location and placement of the lens as well as the location of the incisions for each of the surgeries. There is some evidence, albeit conflicting, to support Dr. Jaffe's opinions, and other evidence cited by Dr. Marvelli was not material. Therefore, we overrule Dr. Marvelli's contention that Dr. Jaffe's opinions are not legally sufficient evidence

---

5. When asked what a retrolenticular mass is, Dr. Key testified: "When [Dr. Augustat] tried to look at the retina on that side he saw a large, probably bulbus, or rounded mass right behind the implant."

of causation based upon assumptions that varied materially from the evidence.

### b. Reliability of Opinions

 Dr. Marvelli's second legal and factual sufficiency complaint asserts that Dr. Jaffe's opinions were scientifically unreliable *ipse dixit* opinions and, therefore, did not constitute evidence of causation.[6] Reliability requires that expert testimony have a foundation in reliable scientific or professional technique or principle. *Robinson*, 923 S.W.2d at 557. "An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statement to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex.1999) (citing *Gammill*, 972 S.W.2d at 726–27).

 Dr. Marvelli points out that Dr. Jaffe never met, examined, or treated Alston, and complains that Dr. Jaffe's credentials as a pioneer in implant surgery, author of the definitive textbook, and his reputation as one of the "premier" and "preeminent" authorities in his field were the sole basis for his bare opinions that were lacking in a scientific or evidentiary basis. Dr. Marvelli contends that Alston's reliance upon her expert's impressive credentials was not enough. With that contention we agree. *See Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex.1999) ("But it is the basis of the [expert] witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.").

Dr. Marvelli points out that the more qualified or credentialed the proposed expert, the greater the danger that the expert will leap the analytical gap between opinion and data and that the jury will adopt the expert's opinion. *See Gammill*, 972 S.W.2d at 726. Alston responds that Dr. Jaffe's theory that horizontal placement is safer was published in his textbooks and peer reviewed journals and had been tested and was accepted by the medical community, as illustrated by the testimony of the other experts who agreed that horizontal placement is the accepted technique, is taught, and is preferred. Indeed, each expert who testified on this subject, except Dr. Marvelli, stated that horizontal placement of the lens gives a stable anchor and is the preferred technique. Additionally, Alston points out, Dr. Jaffe relied upon his "unique knowledge and experience in lens implantation surgery," as well as his previously written textbooks, to support his opinions.

Dr. Jaffe acknowledged that he was aware of no specific studies comparing the frequency of dislocations using the superior approach versus the horizontal approach. He was likewise aware of no studies regarding the effects of eye-rubbing on implants placed temporally or horizontally. Dr. Key, the defense expert, also could find no studies suggesting that positioning the implant at one location would be more difficult to dislocate than another. Dr. Key found no study, no textbook, nor any article regarding whether an implant would be more likely to dislocate at the 2:00 and 8:00 o'clock position than the 3:00 and 9:00 o'clock position.[7] Dr. Key did

---

6. The term *"ipse dixit"* means "something asserted but not proved" and is literally translated "he himself said it." BLACK'S LAW DICTIONARY 833 (7th ed.1999); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).

7. Dr. Jaffe further acknowledged it is well-known that dislocation can occur without trauma, and he has seen it occur even with a sector iridectomy. Even with Dr. Jaffe's preferred horizontal entry and placement, the open hole created by the sector iridectomy is still there, he said. The lens would still be

state, however, that "the more stable and the least irritating, potentially irritating position to the eye is at 3:00 and 9:00 o'clock."

On the other hand, Dr. Jaffe's credentials included authoring twelve textbooks, three of which concerned cataract surgery and its complications and one of which is still considered the "definitive" text on implants, as well as 219 publications in peer review journals, most of which concerned lens implantation procedures. He is a clinical professor at Palmer Eye Institute of the University of Miami, and visiting professor at various institutions around the world. He is a member of several professional associations relating to lens implant surgeries, some international, including being founder and president of the American Intraocular and Implant Society, and has been a practicing, board certified ophthalmologist since 1950.[8]

Although there must be some basis for expert opinion offered to show its reliability, the criteria for assessing reliability will vary depending on the type of expert and the nature of the evidence. *Gammill*, 972 S.W.2d at 726–27. In some instances, "[e]xperience alone may provide a sufficient basis for an expert's opinion in some cases...." *Id.* at 726. Here, the record supports Dr. Jaffe's reliance, not only on his unique clinical experience and expertise in lens implant surgery, but also on his previous peer reviewed writings and his previously written textbooks on the subject, obviously not prepared for judicial use, as well as his knowledge of the practices of other ophthalmologists.

Scrutinizing Dr. Jaffe's opinion testimony by the considerations provided in *Robinson* and its progeny, we conclude that his opinions are not merely subjective *ipse dixit* statements unsupported by scientific principle or data but are reliable as some probative evidence of cause-in-fact.

### c. Loss of Chance Doctrine

Finally, Dr. Marvelli contends that the expert opinions of Dr. Jaffe constituted no evidence of causation because they were improperly based upon "loss of chance" of survival or cure, a theory that was expressly rejected by the Supreme Court of Texas in *Kramer.* 858 S.W.2d at 398 (holding liability barred for negligent medical treatment that decreases patient's chance of survival or cure where an adverse result is already probable); *see also Park Place Hosp.*, 909 S.W.2d at 511 (holding recovery barred for substandard care that merely reduced patient's less-than-even chance of survival).

Dr. Jaffe testified that Dr. Marvelli's technique of "vertical" insertion and placement of the lens in the implantation procedures created a "high chance of dislocation" which did occur. He further opined that Dr. Marvelli's method of insertion and placement of the lens "set her up ... for complications." Again, he said, Dr. Marvelli's placement "increased the likelihood of dislocation." If Dr. Marvelli had placed the first implant horizontally, entering from the side, Dr. Jaffe said, Alston would only have had a "rare chance" of the epithelial downgrowth that caused the loss of her eye.

Dr. Jaffe also testified that dislocations of intraocular implants, in general, are

supported by the iris. It is possible something could still push it into the iridectomy opening even if the lens was inserted horizontally, his way.

**8.** Additionally, Dr. Jaffe testified to a longstanding association as consultant for Alcon Laboratories and its predecessor in interest, which developed the multiflex lens used in this case.

rare and acknowledged that it would be rare even for a lens located the way Dr. Marvelli described—inserted superiorly and rotated to the 1:00 to 2:00 o'clock and 7:00 to 8:00 o'clock position—to dislocate after an implant. Complications with implant surgery are rare, he said, but when they occur they are catastrophic. But then, Dr. Jaffe agreed that everything that had happened in this case had been rare.

On cross-examination, Dr. Jaffe quantified a "high" rate as a two percent rate of dislocation in the type of surgery Alston had, versus a "low" rate, which would be something far less than two percent, stating:

Q. Well, whatever and however you derive your knowledge about the frequency of dislocations using the superior approach, that rate is very low, isn't it?

A. Yes, it is.

Q. And it just happens that it is lower with the horizontal side in your opinion?

A. It's lower.

Q. And you consider a 2% complication rate to be high, correct?

A. In anterior segment surgery?

Q. Yes.

A. Yes.

Q. And so given that case, by implication, a low dislocation rate would be something far less than 2%, wouldn't it?

A. Probably.

Dr. Marvelli argues this testimony amounts to an opinion that Dr. Marvelli's negligence increased the risk of the loss of Alston's eye from something less than two percent to two percent, falling far short of the requirement under Texas law that a plaintiff must show a probability of more than fifty percent that a defendant's negligence in a medical malpractice case caused the loss or harm.

To raise a fact issue on causation and survive a legal sufficiency review, a claimant must do more than show a "substantially elevated risk." *Weiss,* 989 S.W.2d at 125 (citing *Havner,* 953 S.W.2d at 720). While "the precise words of 'reasonable medical probability' are not required, evidence of causation must still rise above mere conjecture or possibility." *Bradley,* 879 S.W.2d at 956. "Reasonable medical probability" is established, in the absence of other reasonable explanations, when it becomes "more likely than not" that the condition or injury complained of resulted from the event. *Lenger,* 455 S.W.2d at 707; *Parker,* 440 S.W.2d at 47; *see also* (Darrell L. Keith, *Loss of Chance: A Modern Proportional Approach to Damages in Texas,* 44 BAYLOR L.REV. 759, 761 (1992)). The effect of the reasonable medical probability standard is to allow recovery only where the measure is "something more than a fifty percent chance." Keith, 44 BAYLOR L.REV. at 762 (quoting from *Lenger,* 455 S.W.2d at 713 (Pope, J., dissenting)); *see also Pustejovsky v. Rapid–Am. Corp.,* 35 S.W.3d 643, 653 (Tex. 2000) (noting "probability" means greater than fifty percent chance); *Southwestern Bell Tel. Co. v. Garza,* 58 S.W.3d 214, 239 n. 18 (Tex.App.-Corpus Christi 2001, no pet.) ("Probability quantified means a more than fifty percent chance.").

The obvious effect of the "reasonable medical probability rule" is to bar a plaintiff from any recovery when a defendant's negligence deprives a plaintiff of only a fifty percent chance or less of survival or avoidance of the ultimate harm. *Kramer,* 858 S.W.2d at 399 (holding plaintiff not entitled to submission of a theory of liability against a hospital for failure to discover her cancer at a time when she had a less than fifty percent chance of

survival); *Park Place Hosp.*, 909 S.W.2d at 511(denying recovery where plaintiff had a less than fifty percent chance of survival at time of negligent removal from respirator). The court in *Kramer* rejected any version of the "loss of chance" doctrine, including the increased risk of harm theory. 858 S.W.2d at 399–400. Evidence of an increased risk of harm, as one version of the loss of chance theory, is not legally sufficient evidence if the risk would not be increased to a probability of greater than fifty percent. *See id.; see also Havner*, 953 S.W.2d at 722.

 Dr. Marvelli argues that Dr. Jaffe's testimony advanced the increased risk of harm theory. We disagree. This case is factually distinguishable from the line of cases involving lost chance of survival or cure arguments, in that no evidence was adduced at trial demonstrating that preexisting illnesses or injuries made Alston's chance of avoiding the ultimate harm improbable even before Dr. Marvelli's negligent conduct occurred. *See, e.g., Kramer*, 858 S.W.2d at 398–99 (involving alleged misdiagnosis of terminal cancer patient with a less than fifty percent chance of survival); *Helm v. Swan*, 61 S.W.3d 493, 496–97 (Tex.App.-San Antonio 2001, pet. denied) (arguing that patient with severe necrotizing pancreatitis lost chance to avoid complications because nurses failed to properly treat the patient); *Bradley*, 879 S.W.2d at 953 (involving alleged failure to diagnose a critically ill patient).

Alston contends that Dr. Jaffe did not rely on the loss of chance doctrine and that his quantification of anterior segment surgery complication rates was in the abstract and not related to her care. While Dr. Jaffe's testimony was couched at times in terms of high, low, or increased "chance,"

we agree that the portion of his testimony emphasized by Dr. Marvelli was generalized and not related to Alston's situation. Dr. Jaffe repeatedly testified that vertical placement and repeated failures to place the implant horizontally caused the dislocations, which necessitated the multiple incisions and loss of Alston's eye. In answer to the direct question of "[w]hat event caused the dislocation[s]," Dr. Jaffe responded that the implant "will find its way into the [sector iridectomy] opening." *Cf. Bradley*, 879 S.W.2d at 956 (stating that while experts can give opinions on ultimate issues, the plaintiffs never once directly asked their expert for an opinion as to whether the defendant's actions proximately caused the injuries complained of). Dr. Jaffe further testified that because "[t]he third implant was placed vertically . . . through the same incision," the result was that "[a] poorly-healed incision caused leakage," and that "[a]s a result of the poor incision," Alston suffered from an epithelium downgrowth, which "resulted in the ultimate loss of the eyeball." Dr. Jaffe further testified that, if Dr. Marvelli had positioned the lens horizontally, in reasonable medical probability the lens would not have dislocated, and regardless of her rubbing her eye, assuming she did rub her eye, Alston would most likely have her vision and her eyeball.[9]

Viewing the totality of Dr. Jaffe's testimony in context, considering its substance, we hold that Dr. Jaffe's testimony of causation is clearly and definitively built upon a series of probabilities and is legally sufficient to establish the cause-in-fact element of proximate cause. For the same reasons, we also hold that the trial court did not abuse its discretion in ruling that Dr. Jaffe's opinions were admissible over Dr.

9. In forming his opinion, Dr. Jaffe also took into consideration reports of Alston's use of alcohol and tobacco.

Marvelli's *Daubert/Robinson* objection. Furthermore, we hold the evidence to be factually sufficient to support the jury's finding as to proximate cause. Accordingly, we overrule Dr. Marvelli's first, second, third, and fourth issues.

### E. Evidence of Damages

In Dr. Marvelli's ninth issue he contends that there is no evidence to support the jury's award of future damages. Dr. Marvelli argues that the evidence does not support a finding of future damages in a ratio of 8 to 1 in comparison to Alston's actual damages. Finally, Dr. Marvelli maintains that the jury's award for future physical disfigurement and mental anguish is not supported by the evidence.

■■■■ The standard of review for a claim of excessive damages is factual sufficiency of the evidence. *Mar. Overseas Corp.*, 971 S.W.2d at 406. We are required to employ the same test for determining excessive damages as for any factual sufficiency question. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). When faced with a factual sufficiency challenge to a jury's verdict, we must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). We are not a fact finder and may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Mar. Overseas Corp.*, 971 S.W.2d at 407.

■■■■ Due to the nature of personal injury damages, i.e., because they are unliquidated and incapable of measurement by any certain standard, the jury has broad discretion in fixing the amount of the award. *J. Wigglesworth Co. v. Peeples*, 985 S.W.2d 659, 665 (Tex.App.-Fort Worth 1999, pet. denied). Matters of past and future physical pain, mental anguish,

and physical impairment are particularly within the jury's province. *Marshall v. Superior Heat Treating Co.*, 826 S.W.2d 197, 200 (Tex.App.-Fort Worth 1992, no writ). Therefore, as long as sufficient probative evidence exists to support the jury's verdict, neither the reviewing court nor the trial court is entitled to substitute its judgment for that of the jury. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *Peeples*, 985 S.W.2d at 666.

■■■■ The evidence reveals that Alston experienced intense pain after her last surgery and prior to the removal of her right eye. From May 16, 1997 until the removal of her dead right eye on January 8, 1999, Alston was in pain. After the removal of her eye, Alston had a prosthetic eye inserted and now has to take care of it. To do so, she must use eye drops to clean her eye twice daily, remove it once a week and clean it with baby shampoo, and she must clean her eye socket to prevent infection. Randy Trawnik, the designer of Alston's prosthetic eye, testified that every five years for the rest of her life, Alston will have to have a new prosthetic eye created and fitted.

After the removal of her eye, Alston developed various vision problems and suffers from low self-esteem. Alston has no depth perception, and very little hand-eye coordination. Due to her lack of vision in one eye, Alston feels socially uncomfortable because she has to stare at people in order to see them. Alston also feels a sense of great sorrow from the loss of her eye. Alston also has other related vision problems due to her blindness in her right eye.

In sum, the evidence reveals that Alston suffers from and will continue to suffer permanent disfigurement, blindness, pain, and embarrassment as a result of her injuries. Based on the above evidence, and mindful of the province of the jury, we hold that the jury's finding of the amount

of future damages for physical pain, mental anguish, and physical impairment is not excessive. *Peeples,* 985 S.W.2d at 666; *Marshall,* 826 S.W.2d at 200. We overrule Dr. Marvelli's ninth issue.

### F. Trial Court's Denial of Dr. Marvelli's Motion for New Trial

In Dr. Marvelli's fifth, seventh, and eighth issues, he argues that the trial court erred in failing to grant his motion for new trial based on newly discovered evidence. More specifically, Dr. Marvelli contends that the trial court did not allow the testimony of Beverly Siefkas, Amanda Siefkas, and Tima Wyatt and in doing so, abused its discretion. Additionally, Dr. Marvelli insists that Alston concealed the testimony of Beverly and Amanda Siefkas and Tima Wyatt, and threatened them with bodily injury or death. Dr. Marvelli maintains that an appropriate sanction for this wrongful behavior is a new trial.

 The party who seeks a new trial on the ground of newly discovered evidence must show: (1) the evidence has come to light after trial; (2) it was not owing to want of due diligence that the evidence did not come to light sooner; (3) the new evidence is not cumulative; and (4) the evidence is so material that it would likely produce a different result if a new trial were granted. *Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983); *Dankowski v. Dankowski,* 922 S.W.2d 298, 305 (Tex.App.-Fort Worth 1996, writ denied). We review the denial of a motion for new trial based on the ground of newly discovered evidence under an abuse of discretion standard. *Jackson,* 660 S.W.2d at 809. In determining whether the trial court abused its discretion, every reasonable presumption will be made on review in favor of orders of the trial court refusing new trials. *Id.* To determine whether the trial court abused its discretion, we must decide ultimately whether the trial court acted without reference to any guiding rules or

principles. *Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997).

### 1. Testimony of Beverly Seifkas

 Dr. Marvelli knew of Beverly Seifkas and her assertion that she had knowledge of relevant facts thirteen days before trial. Further, Dr. Marvelli and counsel met with opposing counsel on several occasions prior to trial and failed to mention Beverly Seifkas. The tardy disclosure of Beverly Seifkas's proposed testimony did not allow opposing counsel any time to depose her. In short, because Dr. Marvelli knew of Beverly Siefkas and the substance of her testimony prior to trial, we hold that he fails to meet the initial element required for a new trial based on newly discovered evidence as to this particular witness.

### 2. Testimony of Amanda Seifkas and Tima Wyatt

 Regarding the testimony of Amanda Seifkas and Tima Wyatt, Dr. Marvelli has not demonstrated that the evidence is not cumulative or so material that it would likely produce a different result if a new trial were granted. The affidavits of both Amanda Siefkas and Tima Wyatt stated that Alston smoked, drank, rubbed her eyes, and fell on her face injuring her eye. At trial, however, it was already established that Alston smoked, drank, rubbed her eyes, and fell injuring her eye. Indeed, it was based on this testimony that the jury determined that Alston was 25% responsible for the loss of her right eye. Dr. Marvelli presented no evidence indicating that the testimony of Amanda Siefkas and Tima Wyatt would not have been cumulative or would have produced a different result. Therefore, after affording every reasonable presumption in favor of orders of the trial court refusing the new trial, we hold that the trial court did not err in denying Dr. Marvelli's motion for new trial. *Jackson,* 660 S.W.2d at 810.

### 3. Alleged Threats to Beverly Seifkas, Amanda Seifkas, and Tima Wyatt and the "Admission by Conduct" Rule

█ Next, Dr. Marvelli contends that Beverly, Amanda, and Tima were threatened by Alston not to testify and, therefore, we should grant a new trial as a sanction for these alleged threats. Additionally, in his sixth issue, Dr. Marvelli argues that Alston's alleged threats constitute an admission by conduct and should have been introduced in order to show that Alston's claim had no merit. In their affidavits, Beverly, Amanda, and Tima state that they were threatened by Alston with either violence or death if they testified or were involved in the case. Alston's affidavit denies having made these alleged threats. Additional evidence revealed that Beverly, Amanda, and Tima did not have a good personal relationship with Alston.

With this evidence before it, the trial court declined to grant Dr. Marvelli's motion for new trial. Because we held above that the trial court correctly excluded the testimony of Beverly, Amanda, and Tima, we are not persuaded by Dr. Marvelli's claim that Alston made threats, abused the discovery process, or that the admission by conduct rule applies. Giving the trial court every reasonable presumption in favor of its order refusing a new trial, we cannot say that the court's refusal involved the violation of a clear legal right or a manifest abuse of discretion. Accordingly, we overrule Dr. Marvelli's fifth, sixth, seventh, and eighth issues. *Jackson*, 660 S.W.2d at 809–10.

### IV. CONCLUSION

Having overruled Appellant's issues on appeal, we affirm the trial court's judgment.