NO. 12-02-00154-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


GRACE TENNYSON, INDIVIDUALLY
§
 APPEAL FROM THE 241ST

AND ON BEHALF OF THE ESTATE AND

STATUTORY BENEFICIARIES OF

SANDRA THOMPSON, DECEASED,

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


STEVE PHILLIPS, M.D., KENNETH

KUMMERFELD, M.D., MOLLY BANKHEAD,

M.D., TERRY WOODARD, M.D., DAVID

JONES, M.D., AND HOWARD GARB, M.D.,

APPELLEES
§
 SMITH COUNTY, TEXAS

 

MEMORANDUM OPINION


 Grace Tennyson, individually and on behalf of the heirs, estate, and statutory beneficiaries
of Sandra Thompson, deceased ("Tennyson"), challenges the trial court's grant of no-evidence
motions for summary judgment in favor of Steve Phillips, M.D. ("Dr. Phillips"), Kenneth
Kummerfeld, M.D. ("Dr. Kummerfeld"), Molly Bankhead, M.D. ("Dr. Bankhead"), Terry Woodard,
M.D. ("Dr. Woodard"), David Jones, M.D. ("Dr. Jones"), and Howard Garb, M.D. ("Dr. Garb"). 
Tennyson raises three issues on appeal. We affirm.

 

Background 

 On July 30, 1998, forty-three-year-old Sandra Thompson ("Thompson") was admitted to East
Texas Medical Center in order to undergo a cardiac angiography in anticipation of future kidney
transplantation. (1) The test revealed that Thompson was suffering from severe coronary artery disease;
therefore, she was scheduled to undergo coronary bypass surgery on August 5. At the time,
Thompson was also suffering from diabetes, end stage kidney failure, hypercoagulable state (a blood
clotting disorder), chronic obstructive lung disease, hypertension, peripheral vascular disease that 
required amputations, and bilateral internal jugular vein thrombosis (clotting in the veins of the
neck).

 After Dr. Phillips performed the bypass surgery on Thompson, she was extubated; however,
Thompson required emergency reintubation because a massive amount of upper airway edema
obstructed her breathing. After consultation with other physicians, the decision was made to perform
an emergency tracheostomy on Thompson because she had an insecure airway. (2) The tracheostomy
allowed Thompson to breathe with the assistance of a mechanical ventilator. This procedure was
performed by Dr. Garb, an ear, nose, and throat surgeon. During this time, she was also being treated
by Dr. Jones, a pulmonologist/critical-care specialist; Dr. Randall; Dr. Phillips, Thompson's heart
surgeon; Dr. Bankhead, her nephrologist; and Dr. Kummerfeld, her cardiologist. 

 On or about August 9, a nurse noted the presence of foul-smelling secretions emanating from
Thompson's tracheal tube. The nurses also noted a rise in Thompson's white blood cell count and
an elevated temperature. Thompson was diagnosed as suffering from ventilator-associated
pneumonia ("VAP") because a culture taken from the tracheal secretions showed the presence of
klebsicella pneumonia, a bacteria that causes VAP. Thompson was then administered antibiotics
in order to fight the infection.

 Thompson's condition began to improve until the afternoon of August 11, when she
sustained a sudden loss of consciousness and an elevated temperature. Dr. Woodard, a nephrologist,
ordered that Thompson's intravenous lines be replaced and prescribed additional antibiotics because
he was concerned that she was developing a line infection. On August 13, Dr. Jones ordered that
a CT scan of Thompson's neck and chest be performed in order to rule out any other problems. The
CT scan revealed that Thompson had an abscess in her mediastinum, a condition also referred to as
a mediastinal abscess. (3) 

 An infectious disease consult was obtained, and Thompson was taken to the emergency room
where a thoracotomy was performed in order to drain the abscess. (4) Shortly after Thompson was
removed from the operating room table, she went into cardiac arrest and after multiple attempts at
resuscitation, she was pronounced dead.

 On October 19, 2000, Tennyson, individually and on behalf of Thompson's heirs, estate, and
statutory beneficiaries, filed a wrongful death and survival action, alleging that Appellees were
negligent toward Thompson and that their negligence deviated from the standard of care in failing
to 1) adequately monitor Thompson's condition, 2) timely diagnose Thompson's infection and
abscess, 3) timely request an infectious disease consultation, and 4) adequately and timely perform
diagnostic tests to adequately diagnose Thompson's condition. (5)

 In support of her allegations and in order to comply with the requirements of the Medical
Liability and Insurance Improvement Act (6) ("the Act"), Tennyson filed an expert report on February
1, 2001. This report was prepared by Dr. David K. Sarver, an infectious disease specialist from
Memphis, Tennessee. On March 1, 2002, Appellees collectively filed a "Motion to Exclude Expert
Testimony of David K. Sarver, M.D.," contending that 1) Dr. Sarver was not qualified to render an
opinion regarding the standard of care applicable to Appellees and 2) Dr. Sarver's opinions on
causation "have no foundation in experience, training, science, or medicine to warrant presentation
to the jury." (7) Tennyson filed a response to the motion on March 20, 2002.

 That same day, the trial court held a hearing on Appellees' motion to exclude Dr. Sarver. 
On March 26, the court granted Appellees' motion excluding Dr. Sarver from testifying on
Tennyson's behalf. On March 27, Dr. Phillips filed a no-evidence motion for summary judgment,
arguing that because Dr. Sarver's testimony had been excluded, Tennyson had therefore produced
no evidence that Dr. Phillips was negligent or that his negligence proximately caused Thompson's
death. The next day, the other appellees collectively filed a no-evidence motion for summary
judgment, basing their motion on the same grounds Dr. Phillips set forth in his motion. On April
25, Tennyson filed responses to both motions. The trial court granted both motions for summary
judgment on May 2 and May 7, respectively, without explanation. On May 31, Tennyson timely
perfected her appeal. 

 On appeal, Tennyson contends that the trial court erred by granting Appellees' no-evidence
motions for summary judgment because Dr. Sarver is a qualified expert who has a reliable basis for
his opinions.


Did the Trial Court Err by Granting Summary Judgment?

 Tennyson contends that the trial court improperly excluded Dr. Sarver's testimony which, 

in turn, paved the way for its order granting Appellees' no-evidence motions for summary judgment.

Standard of Review: No-Evidence Summary Judgment

 The trial court must grant a no-evidence motion for summary judgment unless the non-movant produces evidence that raises a genuine issue of material fact on the challenged element of
his claim or defense. Tex. R. Civ. P. 166a(i). The appellate court reviews evidence presented in
response to a motion for a no-evidence summary judgment in the same way it reviews evidence
presented in support of, or in response to, a motion for traditional summary judgment; it accepts as
true all evidence favorable to the non-movant, indulges every reasonable inference, and resolves all
doubts in favor of the non-movant. Hight v. Dublin Veterinary Clinic, 22 S.W.3d 614, 619 (Tex.
App.- Eastland 2000, pet. denied). A no-evidence motion for summary judgment is improper if the
non-movant presents more than a scintilla of probative evidence to raise a genuine issue of material
fact on the challenged element. Id. More than a scintilla of evidence exists when the evidence "rises
to a level that would enable reasonable and fair-minded people to differ in their conclusions." 
Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).

Standard of Review: Expert Testimony

 A two-part test governs whether expert testimony is admissible: 1) the expert must be
qualified and 2) the testimony must be relevant and be based on a reliable foundation. E.I. du Pont
de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex. 1995). The admissibility of expert
testimony rests largely within the discretion of the trial court. Id. at 558. The test for abuse of
discretion is whether the trial court acted without reference to any guiding rules or principles. Id.;
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985). "The test is not
whether, 'in the opinion of the reviewing court, the facts present an appropriate case for the trial
court's action.'" Robinson, 923 S.W.2d at 558 (citing Downer, 701 S.W.2d at 241-42). The
determination that the appellate court would have ruled differently or that the trial court made an
error in judgment does not constitute an abuse of discretion. Walker v. Packer, 827 S.W.2d 833,
840 (Tex. 1992). However, a trial court has no discretion in determining what the law is or applying
the law to the facts. Id.

 When the trial court does not specify the ground on which it excluded the testimony, we will
affirm the trial court's ruling if any ground is meritorious. K-Mart Corp. v. Honeycutt, 24 S.W.3d
357, 360 (Tex. 2000). Accordingly, we address each of Appellees' objections to Dr. Sarver's
testimony, in turn, to determine whether the trial court could have sustained Appellees' objections
without abusing its discretion.

The Opinion

 In order to properly assess whether the trial court was correct in granting Appellees' motion
to exclude, we must first gain an understanding of the opinion Dr. Sarver rendered in the instant
case. The record before us contains 1) Dr. Sarver's 4590i expert report, 2) Dr. Sarver's deposition
testimony, 3) deposition testimony from Appellees' four experts, and 4) expert reports from
Appellees' four experts. Citing the aforementioned documents, Appellees based their motions on
two grounds: 1) that Dr. Sarver was not qualified to render the opinion he made regarding the
applicable standard of care, and 2) the opinion was not based upon a reliable methodology. 

 In his report, Dr. Sarver states that he is "familiar with the standard of care for the various
health care providers involved in the care of Sandra Thompson" during her hospitalization. After
reviewing Thompson's medical records, Dr. Sarver concludes that 


 the cause of the patients' [sic] death was related to a superior posterior mediastinal abscess and pre-vertebral abscess that resulted from the accidental perforation of the trachea and/or esophagus during
an emergency reintubation following the patients' [sic] acute respiratory arrest. This acute respiratory
arrest occurred shortly after she was extubated following her coronary artery bypass grafting on
8/5/98. Subsequent to this intubation, the patient underwent a tracheotomy. As a result of the
perforating trauma to the trachea and possibly the esophagus, the patient developed the pre-vertebral
soft tissue abscess and cellulitis in the lower neck and in the posterior superior mediastinum. This was
likely due to mixed aerobic, anaerobic, gram-positive, gram-negative bacterial flora associated with
the mouth and upper airways. The patient's death was not related at all to the coronary bypass graft
itself. There was apparently no complication of this operative procedure and the patient did receive
pre-surgical antibiotic prophylaxis with Vancomycin as would be appropriate. The death was also not
related to any catheter sepsis from central venous lines or from arterial venous fistulas or shunts
established for dialysis. Also, the death was not related to her continuous ambulatory peritoneal
dialysis or any complication with it.



 Dr. Sarver also stated his belief that from a "strictly infectious disease standpoint," there was
a "significant likelihood that a traumatic perforation of the trachea and possibly esophagus could
have occurred at that time." Therefore, Dr. Sarver opines that the attending physicians should have
been sensitive to this possibility by watching for any signs or symptoms during subsequent days that
indicated such an event had occurred. Dr. Sarver believes that when the foul-smelling secretions
were noted on August 9, the doctors, knowing that Thompson had undergone a difficult reintubation,
should have thought that they had perforated the trachea and/or esophagus and that Thompson was
developing a "mixed aerobic-anaerobic cellulitis" or abscess in the area of the neck or upper
mediastinum. Dr. Sarver states that he does not believe Thompson's attending physicians took this
possibility into consideration. Thompson was not started on "broad-spectrum anaerobic coverage"
and was only prescribed Trovafloxacin. Dr. Sarver believes that Trovafloxacin "does have some
anaerobic coverage but in lieu of what was possible in [Thompson], [he feels that] better anaerobic
coverage should have been started at that time." In his opinion, the attending physicians should have
consulted with an infectious disease specialist at that time and should also have done a CT scan of
Thompson's neck and chest to see if a mediastinal abscess was developing. Neither of these
measures were taken on August 9. Although an infectious disease consult was obtained on August
13, Dr. Sarver believes the attending physicians waited too long to obtain the consult. After
narrating the remaining events that took place regarding Thompson's care, Dr. Sarver concludes that
"the posterior superior mediastinal abscess was a very significant factor in the cause of this patient's
death and was in fact the proximate cause."

 Dr. Sarver further states that in his opinion, any physician who cared for Thompson,
regardless of his or her specialty, "should have been attuned to the fact that she was highly likely to
develop a posterior neck or posterior mediastinal suprative cellulitis/abscess following the
emergency traumatic reintubation on 8/5/98." He also "find[s] it very surprising" that none of the
attending physicians seemed to be paying close attention to the possibility of infection and were not
watching expectantly for it to occur, nor did any of them include the possibility in the differential
diagnosis noted on Thompson's chart. The prospect of a mediastinal abscess was not entertained
until August 12. Therefore, Dr. Sarver believes that all of Thompson's treating physicians, except
the anesthesiologist, were "guilty of an omission of observation and diagnosis in [Thompson],
certainly from 8/9/98 until 8/12/98 when the CT scan was finally done." After stating his opinion
about the physicians, Dr. Sarver continues that


 [s]imply adding the anaerobic coverage on 8/9/98 and getting an Infectious Disease consult would not
have prevented the patient's death. Surgery was required. However, I feel that if everyone involved
in this case had performed within the standard of care after the emergent traumatic reintubation of
8/5/98, that there is a 51% chance that this patient would have survived this illness. However, I do
hasten to point out that there is no one particular person that is solely considered at fault for what
happened in this situation. 



 During his deposition, Dr. Sarver testified that he believed Appellees were negligent because
they did not consider "the possibility of an esophageal perforation and therefore a mediastinitis from
that." When asked about any indication from Thompson's medical records that led him to believe
that a "traumatic intubation" had occurred, Dr. Sarver replied, 



 Well, the fact that it was difficult. We know that she developed a posterior mediastinal abscess and
mediastinitis. And in this set of circumstances far and away the most likely thing that could have
caused that mediastinal - posterior mediastinal abscess was a traumatic intubation perforating the
esophagus or the trachea causing leakage or solution - for secretions into the posterior mediastinum.



 Dr. Sarver also explained that the foul smell in the room, which is indicative of an anaerobic
infection, should have led a reasonably prudent doctor to diagnose a mediastinal abscess from a
difficult intubation. He also agreed with the assertion that Appellees' differential diagnoses of
ventilator-associated pneumonia and line sepsis were appropriate. Dr. Sarver explained that he
believed Thompson suffered a tracheal and/or esophageal injury because of the difficult emergent
reintubation, the foul smell in the room, and the fact that Thompson eventually had a CAT scan done
where the abscess was found and later drained in surgery. He stated that this explanation was the
"only logical way she could have gotten a posterior mediastinal abscess." 

 When asked about the latest time that surgical drainage could have been done in order to save
Thompson's life, Dr. Sarver responded that it "would be speculation" to answer that question;
however, he believed that if the surgical drainage had been completed on August 9, the possibility
that Thompson would have survived would not have been speculation and that "there is greater than
a 51 percent chance that had it been done on the 9th, that she would have survived this episode." 
He also testified that if the surgical drainage had been performed on August 11, there was still
probably "a greater than 50 percent chance" Thompson would have survived. When questioned
about whether Thompson's chances were 50 or 51 percent, Dr. Sarver stated, "I just think it's more
likely than not. I think that it's more - I think she more likely would have survived than not to have
survived." Dr. Sarver was then pressed about any studies that would support such a hypothesis. He
stated that certain articles from medical literature discussed early diagnosis and treatment, but he
could not quote any statistics. When questioned further about any studies that reflect the
determination of whether surgical drainage in a patient such as Thompson would have altered the
outcome of her condition, Dr. Sarver replied, "Well, yes, it says in these articles that early surgical
drainage often leads to a good result." (8) With regard to his opinion that surgical drainage on August
11 would have made a difference, Dr. Sarver testified that he did not know of any statistics or
controlled studies of exactly the same scenario of facts and all the co-morbidities Thompson suffered
to support such a theory; however, he based the opinions on his general knowledge, experience,
training, and general knowledge of the body of medical literature. 

 Dr. Sarver's three opinions regarding Appellees' breach of the standard of care were 1) the
doctors should have reached the conclusion that Thompson was suffering from a mediastinal abscess
and performed a CAT scan to evaluate whether such a condition existed, 2) the doctors should have
called in an infectious disease expert when the foul smell was noted on August 9, and 3) the doctors
prescribed inappropriate therapy to combat Thompson's condition. 

Is Dr. Sarver Qualified?

 Texas Rule of Evidence 702 permits a witness qualified as an expert by knowledge, skill,
experience, training, or education to testify on scientific, technical, or other specialized subjects if
the testimony would assist the trier of fact in understanding the evidence or determining a fact issue. 
Tex. R. Evid. 702. (9) Whether an expert is qualified is a preliminary question to be decided by the
trial court. Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex. 1998). The
offering party must demonstrate that the witness possesses special knowledge on the precise matter
that he is called to testify about. Id. at 718-19. Physicians are not automatically qualified as experts
merely because they possess a medical degree; therefore, the inquiry must center on the expert's
actual qualifications for rendering an opinion on the issue. Broders v. Heise, 924 S.W.2d 148, 152
(Tex. 1996).

 In Broders, the issue was whether the trial court abused its discretion in excluding the
opinion of an emergency physician that three defendant emergency physicians and the defendant
hospital caused a patient's death when the defendant physicians failed to diagnose her head injury. 
Id. at 149. In reversing the court of appeals' judgment, the supreme court held that the trial court
did not abuse its discretion in excluding the plaintiffs' expert opinion on causation because, while
the expert plainly had a greater knowledge of medicine generally than a lay person, he did not have
specialized knowledge on the issue of cause in fact. Id. at 153. Although the expert knew that
neurosurgeons should be called to treat head injuries and what treatments they could provide, he
never stated that he knew, from either experience or study, the effectiveness of those treatments in
general, and specifically, in that case. Id. 

 In the instant case, Appellees objected to Dr. Sarver's qualifications on the basis that he


 failed to demonstrate his expertise on the standards that should be followed by pulmonologists,
cardiologists, nephrologists, or otolaryngologists in the post-operative care and treatment of a patient
suffering from multiple co-morbid conditions who allegedly developed a mediastinal abscess as a
result of intubation procedures. 



 In a medical malpractice case, a plaintiff must establish the following elements: 1) a duty
requiring the defendant to conform to a certain standard of conduct, 2) the applicable standard of care
and its breach, 3) the resulting injury, and 4) a reasonably close causal connection between the
alleged breach of the standard of care and the alleged injury. Blan v. Ali, 7 S.W.3d 741, 744 (Tex.
App.-Houston [14th Dist.] 1999, no pet.). In the instant case, Tennyson sought Dr. Sarver's services
in order to establish each of these critical elements; specifically, that Appellees' conduct fell below
the applicable standard of care by failing to timely diagnose and treat Thompson's mediastinal
abscess. 

 Dr. Sarver is a medical doctor, licensed in Tennessee, and has been practicing medicine for
29 years. He is currently enrolled in law school and although he no longer sees patients in the
hospital, he is in private practice "part-time" and sees patients on an outpatient basis. (10) He sees his
own patients, as well as others who are referred to him for infectious disease and general internal
medicine. 

 Dr. Sarver is board certified in internal medicine and is also board certified in the
subspecialty of infectious diseases by the American Board of Internal Medicine. His curriculum
vitae reflects that he has also written approximately four articles on issues related to infectious
disease. He further testified that he has never personally treated a mediastinal infection that occurred
as a result of intubation procedures, but had practiced with another doctor who had encountered the
condition. Dr. Sarver has also treated patients who have been diagnosed as suffering from ventilator-assisted pneumonia and retropharyngeal abscesses. When asked about the tests to be used to
diagnose a posterior mediastinal abscess, Dr. Sarver responded that "a routine chest x-ray might be
used, but that's often not revealing because you often don't see a widening of the mediastinum." If
the possibility of a mediastinal abscess is high on a doctor's differential diagnosis, Dr. Sarver
testified that further testing would be "a chest CAT scan, with contrast if possible, and white blood-cell labeled Indium scan." Dr. Sarver also stated that he has ordered a chest CAT scan when trying
to determine whether a patient had a mediastinal abscess on two or three occasions. He testified that
an article in Mandell's Textbook of Infectious Diseases discusses the causes of mediastinitis,
one of which is intubation.

 Dr. Sarver also admitted that he is not certified in, nor has he ever practiced as, a
pulmonologist, an ear, nose, and throat specialist, a cardiovascular surgeon, or a nephrologist. He
testified that he has seen cases of mediastinitis, and "when those types of cases are picked up
relatively early, before the patient decompensates, surgical drainage is done and the patient
survives." He has treated a patient who developed a mediastinal infection after a bypass and has
treated patients with a mediastinal infection and some chronic renal failure due to diabetes. He has
also had patients for whom he ordered an early surgical drainage of a mediastinal infection and the
patient survived. He also said, however, that he had never treated a mediastinal infection in
connection with a patient, such as Thompson, who had end-stage renal failure, neuropathy,
hypercoagulability, bilateral internal jugular thrombosis, chronic hypertension, a bypass surgery for
a left main occlusion together with a total right coronary occlusion, and amputations as a result of
bad peripheral vascular disease. 

 Appellees base their objections on the argument that Dr. Sarver, an infectious disease expert,
cannot testify as to the standard of care that each Appellee, in his specific specialty, should have
followed because Dr. Sarver does not practice in any of those specialized areas. This argument is
without merit. Although not just any medical doctor can testify about everything regarding medical
care, it is well settled that a physician expert witness does not have to be a specialist in the particular
branch of the profession for which the testimony is offered. See Blan, 7 S.W.3d at 745; Broders,
924 S.W.2d at 154. Indeed, trial courts may qualify a medical witness of a different specialty to
testify if the witness has practical knowledge of what is usually and customarily done by other
practitioners under circumstances similar to those confronting the malpractice defendant. Id. 

 In the case at bar, Tennyson has alleged that Thompson died as a result of Appellees' failure
to timely diagnose and treat a mediastinal abscess that had formed in Thompson after a problematic
intubation. Where the emergency physician in Broders testified that a neurologist should have been
called to treat a head injury, but was unfamiliar with a neurologists' methods, the circumstances of
Tennyson's case deal directly with the proper treatment of an infection-the area in which Dr. Sarver
is a board-certified physician. Based on Dr. Sarver's experience and training in the area of infectious
disease, testimony, and report, the trial court could not have based its decision to exclude his
testimony on the fact that he was not qualified to render an opinion on the standards of care
regarding the proper treatment of a mediastinal abscess. Therefore, we must determine whether the
trial court based its decision on the reliability and relevancy of Dr. Sarver's methodology in reaching
his opinions.

Were Dr. Sarver's Testimony and Report Relevant and Based on a Reliable Foundation?

 Whether an expert's testimony is reliable is a preliminary question for the trial court. 
Gammill, 972 S.W.2d at 718. In executing this responsibility, a trial court is not to determine
whether an expert's conclusions are correct, but only whether the analysis used to reach those
conclusions is reliable. (11) Id. However, when the expert's underlying scientific technique or
principle is unreliable, the expert's opinion is no more than subjective belief or unsupported
speculation and is inadmissible. Robinson, 923 S.W.2d at 557. An expert's testimony can be
unreliable even when the underlying data is sound if the expert draws conclusions from that data
based on flawed methodology. Havner, 953 S.W.2d at 721-29. There also may be simply too great
an "analytical gap" between the data and the opinion proffered for the opinion to be reliable. 
Gammill, 972 S.W.2d at 726. Furthermore, "[a]n expert's simple ipse dixit is insufficient to
establish a matter; rather, the expert must explain the basis of his statement to link his conclusions
to the facts." (12) Marvelli v. Alston, 100 S.W.3d 460, 478 (Tex. App.-Fort Worth 2003, pet. denied)
(citing Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999)).

 In Robinson, the Texas Supreme Court promulgated six factors that help to determine
whether expert testimony is reliable:


 1) the extent to which the theory underlying the expert's testimony has been tested;

 2) the extent to which the technique relies upon the subjective interpretation of the expert;

 3) whether the theory has been subjected to peer review and/or publication;

 4) the technique's potential rate of error;

 5) whether the underlying theory or technique has been generally accepted as valid by the
relevant scientific community; and

 6) the nonjudicial uses which have been made of the theory.



Robinson, 923 S.W.2d at 556-57. 

 To constitute evidence of causation, a medical expert's opinion must rest in reasonable
medical probability. Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 500 (Tex. 1995). 
"'Reasonable medical probability' is established, in the absence of other reasonable explanations,
when it becomes 'more likely than not' that the condition or injury complained of resulted from the
event." Marvelli, 100 S.W.3d at 480. The effect of the reasonable medical probability standard is
to allow recovery only where the measure is "something more than a fifty percent chance." Id.

 In stating his opinion, Dr. Sarver expounded at length with regard to the proper standard of
care when diagnosing and treating a mediastinal abscess and the duties involved in meeting those
standards. However, with regard to the causal connection between Appellees' breach of the standard
of care and Thompson's injury, her death, Dr. Sarver opined that 1) if the surgical drainage had been
completed on August 9, there is greater than a 51 percent chance, or "more likely than not," that
Thompson would have survived, 2) Thompson's death was not related at all to the coronary bypass
graft itself, 3) there was apparently no complication of this operative procedure, 4) the death was not
related to any catheter sepsis from central venous lines or from arterial venous fistulas or shunts
established for dialysis, 5) the death was not related to her continuous ambulatory peritoneal dialysis
or any complication with it, and 6) when asked about any studies that reflect the determination of
whether or not surgical drainage in a patient such as Thompson would have altered the outcome of
her condition, Dr. Sarver replied, "Well, yes, it says in these articles that early surgical drainage often
leads to a good result."

 After reaching these opinions, Dr. Sarver does not explain how he reached them, other than
by stating that he believed that Thompson died as a result of the failure to timely treat the mediastinal
abscess based on his general knowledge, experience, training, and general knowledge of the body
of medical literature. Nowhere in his opinion does he proffer any testing, peer review, potential rate
of error, or general acceptance of his hypothesis that the mediastinal abscess ultimately caused or
was a contributing cause of Thompson's death. In fact, Dr. Sarver does not state in his opinion how
a mediastinal abscess or infection causes death in general, or specific to this case, a cardiac arrest,
but states only that when such an infection is treated early, it "often leads to a good result." There
is simply an "analytical gap" in Dr. Sarver's analysis on how the failure to timely diagnose and treat
the mediastinal abscess ultimately caused Thompson's death. Accordingly, Dr. Sarver's opinion on
the cause of Thompson's death is ultimately based on his own speculation and ipse dixit testimony,
which constitutes no evidence. See Onwuteaka v. Gill, 908 S.W.2d 276, 283 (Tex. App.-Houston
[1st Dist.] 1995, no writ) ("An expert's opinion regarding causation that is based completely on
speculation and surmise amounts to no evidence"). 

 We recognize the inherent problem presented in medical causation testimony when
comparing the less-stringent "reasonable medical probability" (as Dr. Sarver testified to in his
opinion) with the unyielding Robinson factors. Although a doctor can testify with regard to a
reasonable medical probability, the evidence of causation must still rise above mere conjecture or
possibility. See Marvelli, 100 S.W.3d at 480. The record in the instant case is devoid of any
evidence to raise Dr. Sarver's opinion on causation above conjecture or possibility; therefore, the
trial court did not abuse its discretion in excluding Dr. Sarver's testimony. (13) 

 Dr. Sarver's testimony was the sole evidence in support of Tennyson's medical malpractice
cause of action. Once Dr. Sarver's testimony was excluded from the case, Tennyson was left with
no evidence to defeat Appellees' no-evidence motion for summary judgment. Accordingly, the trial
court did not err in granting Appellees' no-evidence motion. See Tex. R. Civ. P. 166a(i).


Conclusion

 After finding that the opinion of the medical experts in Helm did not meet the Robinson
criteria, Chief Justice Hardberger concluded that


 [t]his case illustrates the harshness of the rule that has developed in Texas restricting expert testimony. 
Based on their clinical experience and practice, two qualified experts testified that the standard of care
was breached by the failure to provide prompt fluid resuscitation. This is not junk science.



Helm, 61 S.W.3d at 498. Dr. Sarver's opinion was not "junk science" either. It was based on his
experience and training; however, his opinion that the failure to timely diagnose and treat the
mediastinal abscess caused Thompson's death failed to meet any of the judicially-created criteria for
expert testimony. Therefore, we hold that the trial court did not abuse its discretion in excluding Dr.
Sarver from testifying in the instant case and, in turn, did not err in granting Appellees' no-evidence
motion for summary judgment. The trial court's judgment is affirmed. 




 SAM GRIFFITH 

 Justice



Opinion delivered January 14, 2004.

Panel consisted of Worthen, C.J., and Griffith, J.

DeVasto, J., not participating.





(PUBLISH)
1. A "cardiac angiography" is an examination of the blood vessels of, near, or relating to the heart using x-rays following the injection of a radiopaque substance. The American Heritage Steadman's Medical
Dictionary 45, 127 (1995). 
2. A "tracheostomy" is a procedure where an incision is made in the trachea in order to insert a catheter or
tube into the trachea to facilitate breathing. The American Heritage Steadman's Medical Dictionary 843
(1995). 
3. A "mediastinal abscess" is a collection of pus formed by tissue destruction in the area of a localized
infection in the region of the body between the pleural sacs, which contains the heart and all of the thoracic viscera
except the lungs. The American Heritage Steadman's Medical Dictionary 4, 497 (1995). 
4. A "thoracotomy" is an incision into the chest wall. The American Heritage Steadman's Medical
Dictionary 832 (1995).
5. In addition to Appellees, Tennyson's original petition also named East Texas Medical Center and/or East
Texas Medical Center Regional Health Care System, Matthew McCarty, M.D., Samuel Houston, M.D., Michael
Hendricks, M.D., Hampton Williams, M.D., S.K. Armstrong, M.D., Bob Gaddy, M.D., and Kurt Reuland, M.D. On
May 1, 2001, Tennyson filed a notice of nonsuit with regard to Samuel Houston, M.D. On May 21, Tennyson
nonsuited the remaining defendants who are not parties to this appeal. 
6. Tex. Rev. Civ. Stat. Ann. art. 4590i (Vernon Supp. 2002).
7. On March 15, 2002, Dr. Phillips filed an individual motion to exclude Dr. Sarver's testimony, setting forth
the same argument that was made in the prior motion to exclude; namely, that Dr. Sarver is not qualified to render an
opinion on causation and that his opinions are not supported by experience, training, science, or medicine.
8. None of the articles relied on by Dr. Sarver at his deposition were included in any of the responses to
Appellees' motions or as an attachment to any other document in the clerk's record.
9. We also note that at the time this claim arose, section 14.01(a) of the Act described an expert witness in a
medical malpractice case as a physician who: 1) is practicing medicine at the time such testimony is given or was
practicing medicine at the time the claim arose, 2) has knowledge of accepted standards of medical care for the
diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, and 3) is qualified on the basis
of training or experience to offer an expert opinion regarding those accepted standards of medical care. Tex. Rev.
Civ. Stat. Ann. art. 4590i, § 14.01(a) (Vernon 2003). 
10. Dr. Sarver testified at his deposition that he sees patients about "two half days a week probably on the
average," depending on his law school class schedule. He also testified that before practicing part-time, he
maintained a full-time private practice and ceased his hospital practice in April of 2000. 
11. The Second Circuit also cautioned trial judges against taking this responsibility too far, for that "would
elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depths of an
expert witness's soul-separating the saved from the damned. Such an inquiry would inexorably lead to evaluating
witness credibility and weight of the evidence, the ageless role of the jury." McCullock v. H.B Fuller Co., 61 F.3d
1038, 1045 (2nd Cir. 1995).
12. The term "ipse dixit" means "something asserted but not proved" and is literally translated "he himself
said it." See Marvelli, 100 S.W.3d at 475 n. 1.
13. Because the trial court correctly excluded Dr. Sarver's testimony, we need not discuss whether, as one of
Appellees' bases for summary judgment, the now-defunct "lost chance of survival" cause of action applies to this
case. See Kramer v. Lewisville Mem. Hosp., 858 S.W.2d 397, 404-07 (Tex. 1993); see also Helm v. Swan, 61
S.W.3d 493, 497 (Tex. App.-San Antonio 2001, pet. denied).