# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00530-CV

---

**Appellant, Bryan Miller// Cross-Appellant, Claudia Miller**

**v.**

**Appellee, Claudia Miller// Cross-Appellee, Bryan Miller**

---

**FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY**
**NO. D-1-FM-21-001119, THE HONORABLE MADELEINE CONNOR, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant/Cross-Appellee Bryan Miller and Appellee/Cross-Appellant Claudia Miller both appeal from the trial court's Modified Final Decree of Divorce (the Decree).[1] By four issues, Bryan contends that the trial court erred by (1) failing to make certain additional findings of fact and conclusions of law, preventing him from adequately presenting his appeal; (2–3) finding that Bryan abused the discovery process and imposing a sanction without notice or hearing; and (4) awarding Claudia attorney's fees without sufficient evidence. By two issues, Claudia contends the trial court erred by: (1) characterizing certain community property as Bryan's separate property; and (2) calculating child support based on an amount not supported by the evidence. We affirm in part and reverse in part. We remand the trial court's child-support

---

[1] Because the parties share a surname, we refer to them by their first names for ease of reference.

order for a recalculation of guideline child support, and we remand for a new trial on the division of community property.

## I.     BACKGROUND

Bryan and Claudia married on March 26, 2017.  They share one child together, Z.I.M. (Zara).[2]  On March 2, 2021, Claudia filed an original petition for divorce.  Later that month, Bryan filed his answer and counterpetition.  Both parties sought to confirm certain property as their separate property.

On May 13, 2022, Claudia filed an amended petition for divorce, seeking, in relevant part, that the divorce be granted on the grounds of cruel treatment and irreconcilable differences and asserting a waste claim against Bryan.

A two-day bench trial took place from October 17–18, 2022.  Because the parties primarily contest the trial court's characterization and division of property, we summarize the proceedings solely as they pertain to those issues and omit from our recitation of the evidence that which does not bear on our analysis.  *See* Tex. R. App. P. 47.1.

### A.     John Knox

Bryan retained John Knox, a certified public accountant, to testify regarding Bryan's separate-property claims.  According to Knox, as relevant here, Bryan had a separate-property interest in the following assets:

- E*Trade account ending in 5017;

- E*Trade account ending in 3901;

---

[2]  To protect the identity of the minor child in this appeal, we refer to her using a pseudonym. *See* Tex. R. App. P. 9.8(b)(2); Tex. Fam. Code § 109.002(d).

- E*Trade account ending in 9520;

- The Kennedy Street residence;

- The Hill Stable residence; and

- The Thrift Savings Retirement Plan.

The trial court admitted into evidence a report created by Knox and dated January 23, 2022. Knox's report details that he reviewed "monthly investment and retirement monthly [sic] statements from January 1, 2017, through June 30, 2021, and real estate documents related to purchases and sales of property" to determine the separate-property character of these assets. The documents reviewed by Knox were not admitted into evidence. Knox further represented in his report that the "information presented for review. . . . was not all-inclusive."

Knox testified at trial that his general tracing method was to "assume[] all assets at date of marriage were separate, and the additions, through contributions and earnings, were community property." He acknowledged on cross-examination that this method resulted in several errors. For instance, when one of the accounts fell below Bryan's original separate-property interest, Knox assigned a negative value to the community's interest in the account, rather than subtract from Bryan's separate-property interest. He also acknowledged that his report was "not an accurate representation of what could be community and what could be separate property for the financial accounts," since over a year had elapsed between the final statements he reviewed and his testimony. However, he believed that "[n]ot reviewing statements . . . after date of marriage did not compromise the community at all," and that "[t]he only thing it did is perhaps compromise [Bryan]'s separate property position."

3

### 1. E*Trade 5017 Account

Knox's report details that this account "was opened prior to marriage" and "was invested in various publicly traded securities." Knox did not detail the date this account was opened or what its value was on the date of marriage. Knox specified that he was only able to trace this account "from January 1, 2017, through March 31, 2018," and then again from "April 1, 2019," through June 30, 2021, as certain statements were missing.

The report detailed that on March 29, 2018, $26,871 was transferred out of this account for the purchase of the Kennedy Street residence. According to the report, the balance in the account after the transfer "was $1,991.21 consisting solely of the separate funds of Bryan . . . . The community funds were exhausted." Knox reported that "[a]s of March 31, 2018, the account had no community property."

Knox listed the securities held in the account on March 31, 2018, and June 30, 2021, and attributed the increase in the number of shares and cash held in the account to the community estate. Knox did not list the securities held in the account on any other date or the values of these shares on any date. Nevertheless, Knox ultimately concluded that, as of June 30, 2021, this account consisted of $10,405.13 in community funds and $50,793.43 in Bryan's separate funds.

### 2. Kennedy Street Residence

According to Knox's report, on March 18, 2018, Bryan used $26,698.42 in separate funds and $172.58 in community funds from the E*Trade 5017 account to place a down payment on the Kennedy Street residence. The parties also used $300.53 in "[o]ther cash" for a total down payment of $27,171.53. The community estate also paid closing costs of $8,049.88

4

and acquired a $240,885.00 mortgage. Thus, the total amount expended for the purchase of the Kennedy Street residence was $276,106.41. Therefore, according to Knox, Bryan enjoyed a 9.67% separate-property interest in the Kennedy Street residence and the community enjoyed a 90.33% interest in the property.

### 3. Twine Drive Residence

Knox detailed that Bryan purchased the Twine Drive residence in Corpus Christi, Texas on May 17, 2015, prior to the parties' marriage. His report also details that the property sold on August 30, 2019, and netted Bryan $89,259.34 after the mortgage payoff and closing costs.

### 4. E*Trade 9520 Account

Knox's report details that this account "was opened prior to marriage" and "was traced [f]rom March 1, 2017, through December 31, 2019." Knox testified that this account held about $91,000 in Bryan's separate funds on the date of marriage.

According to the report, on September 3, 2019, Bryan deposited the proceeds from the sale of the Twine Drive residence into this account. A $100 fee was charged, resulting in a net deposit of $89,159.34. Knox's report details that the balance in the account after this deposit "was $91,486.45[,] consisting of $1,748.10 community funds and $89,738.35 separate funds of Bryan."

According to the report, on September 5, 2019, Bryan wired $68,996.35 of his separate-property funds from this account to Concierge Title of Texas for the purchase of the Hill Stable residence. Knox detailed that the balance in the account after this wire transfer "was $21,350.15 consisting of $1,608.15 community funds and $19,742.00 separate funds of Bryan."

5

### 5. Hill Stable Residence

According to Knox's report, the Hill Stable residence was purchased on September 4, 2019, for $265,000, using the $68,996.35 transfer from the E*Trade 9520 account discussed above as a down payment. The remaining funds were contributed by the community primarily through a mortgage. Based on this, Knox calculated that Bryan had a 26.04% separate interest in the Hill Stable residence while the community had a 73.96% interest.

### 6. Thrift Savings Plan

Bryan worked for the federal government and participated in a Thrift Savings Plan as a benefit of his employment. Knox agreed in his testimony that this plan was akin to a 401(k) retirement account. According to Knox's report, he traced the retirement account "from March 23, 2017, through September 30, 2021." Knox did not specify how much was held in the Thrift Savings Plan on the date of marriage, but determined that, as of September 30, 2021, the plan consisted of $52,124.99 community property and $29,317.20 separate property. The report did not detail what assets were held in the plan but stated that it "consists of various funds similar to mutual funds invested in government securities."

### 7. E*Trade 3901 Account

Knox testified that on the date of marriage, this account held $263.72 in community funds and $40,146.25 in separate funds. Knox's report details this account "was opened prior to marriage" but does not specify when and that it "was invested in various publicly traded securities and mutual funds" but does not specify which. The report details that the account was traced "from January 1, 2017, through June 30, 2019." Knox concluded that on

June 30, 2021, the account contained $263.72 in community funds and $40,146.25 in Bryan's separate funds.

**B.      Bryan**

At trial, Bryan testified that, on the date of marriage, the E*Trade 5017 account had $50,000 in it, and "[t]he only things that were added into that account were capital gains." However, he testified that on the date of trial, the E*Trade 5017 account had "two cents." Bryan agreed that he used this account to make a down payment on the Kennedy Street residence. Bryan testified that, at the time of trial, he believed the Kennedy Street residence was worth approximately $479,000.

Bryan testified that he deposited the proceeds from the Twine Drive residence into the E*Trade 9520 account and then used "let's say 80 percent" of those proceeds as a down payment on the Hill Stable residence. Bryan specified that "the whole purpose of buying" the Hill Stable residence was to rent it out. And, indeed, after purchasing the property, Bryan and Claudia rented it out "from the time it was purchased to about a year and a half later." According to Bryan, rental income from this property was deposited into the E*Trade 9520 account. Bryan testified that he used the E*Trade 9520 account "for everyday expenses" and that it had $385 in it on the date of trial.

Bryan testified that he had worked for various agencies of the federal government for twelve years total. He explained that at the time of trial, he earned approximately "115- per year." He did not discuss how much he contributed to his Thrift Savings Plan prior to the marriage, but he agreed that Knox found that the plan contained $29,000 of his separate property on the date of marriage.

Several statements from the E*Trade accounts were admitted into evidence, solely showing annual account activity for the years 2021 and 2022. According to a statement from September 2022, Bryan's salary was directly deposited into the E*Trade 9520 account. Additionally, a statement from the E*Trade 5017 account shows that Bryan purchased $15,692.04 and sold $58,577.23 of investments between July 1, 2022, and September 30, 2022.

At some point between July 1, 2022, and September 30, 2022, Bryan sold $15,554.09 worth of securities from the E*Trade 3901 account. The statement also shows that there were no contributions made to the account during 2021. Another statement shows that the beginning balance in the E*Trade 3901 account on June 30, 2022, was $19,208.66. Bryan further detailed that, as of the date of his testimony, the E*Trade 3901 account contained $19,761.

Bryan agreed that he spent approximately $115,000 in attorney's fees over the course of the litigation and that, as a result, his separate property was diminished by nearly half.

## C.     Edward Aiken

Edward Aiken, a certified residential-real-estate appraiser retained by Claudia, testified that he valued the Kennedy Street house at $425,000 as of July 12, 2021. Aiken testified that "in the last year," property around Austin increased in value by approximately "12 percent." However, he declined to speculate on whether the Kennedy Street property had increased in value.

## D.     Other Relevant Evidence

Both parties submitted their proposed disposition of the issues, assigning certain values to the parties' claimed separate and community property and requesting the trial court

award certain community property to one party or the other and confirm certain property as their separate property.

## E.     Post-Trial Proceedings

After the trial concluded, the court took the matter under advisement. On November 7, 2022, the court sent a letter ruling to the parties, granting the divorce on the grounds of cruelty. The trial court also granted Claudia's waste claim and awarded "a just-and-right decision [sic] of the marital estate as a 65/35 split in favor of Claudia." The court did not confirm the property discussed above as Bryan's separate property but divided it as part of the community estate. The trial court also awarded Claudia "[s]ixty-five percent (65%) of the attorneys' fees proven by [her]," to be paid by Bryan "after division of the marital estate is accomplished."

On June 2, 2023, the trial court signed its original final decree of divorce. On June 29, 2023, Bryan filed a motion to modify the trial court's judgment, requesting, inter alia, that the trial court reconsider its determination as to whether certain property was Bryan's separate property.

On September 13, 2023, the trial court signed the Decree at issue in this case. As relevant here, this Decree confirmed as Bryan's separate property: (1) a 9.67% proportional interest in the Kennedy Street residence, (2) a 26.04% proportional interest in the Hill Stable residence, (3) $40,146.35 in the E*Trade 3901 account, (4) $50,793.43 in the E*Trade 5017 account, and (5) $29,317.20 in the Thrift Savings Plan. After confirming this as Bryan's separate property, it divided the remaining assets 65/35 in Claudia's favor. The trial court also awarded Claudia $56,690.86 in attorney's fees "[t]o effect an equitable division of the estate of

9

the parties." Further, the trial court found that Bryan's net monthly resources were $4,500 per month and ordered him to pay $900 per month in child support.

Bryan timely requested findings of fact and conclusions of law and filed a notice of past-due findings of fact and conclusions of law. While this appeal was pending and at Bryan's behest, we abated the appeal for the trial court to make findings of fact and conclusions of law.

On December 11, 2023, the court issued findings of fact and conclusions of law, generally mirroring its Decree. It also found that the amount of child support awarded was "pursuant to the guidelines set forth in the Texas Family Code" and was "in accordance with the percentage guidelines." On December 20, 2023, Bryan requested additional and amended findings of fact and conclusions of law, seeking, specifically, "findings of fact and conclusions of law regarding the **value** of all assets, liabilities, claims, and offsets on which disputed evidence has been presented." The trial court did not supplement its findings.

## II. CLAUDIA'S CLAIMS ON APPEAL

Because Claudia's claims on appeal are also dispositive of the entire case, we address them first.

### A. Mischaracterization of Assets

#### 1. Standard of Review

Separate property consists of: (1) the property owned or claimed by the spouse before marriage; (2) the property acquired by the spouse during marriage by gift, devise, or descent; and (3) personal-injury awards, except awards for loss of earning capacity during the marriage. Tex. Fam. Code § 3.001. Community property consists of any property, other than

10

separate property, acquired by either spouse during the marriage. *Id.* § 3.002; *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 607 (Tex. App.—Houston [14th Dist.] 2004, no pet.). "Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." Tex. Fam. Code § 3.003(a). "To overcome this presumption, the spouse claiming separate property must trace and clearly identify the property claimed to be separate." *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Id.* "While the burden of tracing is difficult, it is not an impossible burden to sustain." *Irvin v. Parker*, 139 S.W.3d 703, 708 (Tex. App.—Fort Worth 2004, no pet.).

We review a trial court's characterization of property in a divorce for an abuse of discretion. *O'Connor v. O'Connor*, No. 03-23-00407-CV, 2025 WL 2147786, at *6 (Tex. App.—Austin July 30, 2025, no pet. h.) (mem. op.). "Under an abuse of discretion standard, legal and factual sufficiency challenges to the evidence are not independent grounds of error, but are relevant factors in assessing whether the trial court abused its discretion." *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Because the sufficiency-of-the-evidence and abuse-of-discretion standards of review often overlap in family-law cases, we apply a hybrid analysis. *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.). This analysis involves a two-pronged inquiry, and we ask whether the trial court (1) had sufficient information on which to exercise its discretion, and (2) erred in its application of that discretion. *Zeifman*, 212 S.W.3d at 588. "The traditional sufficiency review comes into play with regard to the first question; however, the inquiry does not end there." *Id.* "The appellate court then proceeds to determine whether, based on the

11

evidence, the trial court made a reasonable decision, that is, that the court's decision was neither arbitrary nor unreasonable." *Id.*

"The degree of proof necessary to establish that property is separate property is clear and convincing evidence." Tex. Fam. Code § 3.003(b). Because the degree of proof at trial is heightened, we apply a heightened standard in our review of the evidence. *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). Thus, in our legal-sufficiency review, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). And in our factual sufficiency review, we review all of the evidence in a neutral light and determine whether a reasonable factfinder could form a firm belief or conviction that its finding was true. *In re C.H.*, 89 S.W.3d at 18–19.

"We resolve any doubt about the characterization of property in favor of community status." *Eichhorn v. Eichhorn*, No. 03-20-00382-CV, 2022 WL 1591709, at *4 (Tex. App.—Austin May 20, 2022, no pet.) (mem. op.) (citing *Goyal v. Hora*, No. 03-19-00868-CV, 2021 WL 2149628, at *6 (Tex. App.—Austin May 27, 2021, no pet.) (mem. op.)). Ordinarily, "the clear and convincing evidence standard requires documentary evidence tracing the separate property nature of the property." *Id.* at *3. But "[a] party's own testimony is sufficient to rebut the community property presumption if it is uncontroverted." *Bean v. Bean*, 658 S.W.3d 401, 417 (Tex. App.—Dallas 2022, pet. denied); *C.S.S. v. A.S.*, No. 03-23-00523-CV, 2024 WL 4163557, at *5 (Tex. App.—Austin Sept. 12, 2024, no pet.) (mem. op.).

"When a trial court mischaracterizes community property as a spouse's separate property . . . , we must conduct a harm analysis to determine whether the mischaracterization caused the trial court to abuse its discretion in its division of the community estate." *DeSpain*

*v. DeSpain*, 704 S.W.3d 866, 870 n.2 (Tex. App.—Austin 2024, no pet.). "If the mischaracterized property has value that would have affected the trial court's just and right division, then the mischaracterization is harmful and requires the appellate court to remand the entire community estate to the trial court for a just and right division of the properly characterized community property." *McElwee v. McElwee*, 911 S.W.2d 182, 189 (Tex. App.— Houston [1st Dist.] 1995, writ denied). "If, on the other hand, the mischaracterized property had only a *de minimis* effect on the trial court's just and right division, then the trial court's error is not an abuse of discretion." *Id.* If we determine that "the trial court mischaracterized the property and that mischaracterization affected the just and right division of the community estate, we must remand the entire community estate for a just and right division based upon the correct characterization of the property." *Garza v. Garza*, 217 S.W.3d 538, 549 (Tex. App.—San Antonio 2006, no pet.).

### 2. Analysis

Claudia contests the trial court's finding that the following properties consist partially of Bryan's separate property: (1) the Kennedy Street residence, (2) the Hill Stable Residence, (3) Thrift Savings Plan, (4) E*Trade 5017 account, and (5) E*Trade 3901 account.

#### a. Kennedy Street Residence & E*Trade 5017 account

The trial court found that Bryan had a 9.67% separate-property interest in the Kennedy Street residence.

The evidence tracing this separate-property interest is as follows: (1) according to Knox, Bryan opened the E*Trade 5017 account at some point prior to marriage; (2) Bryan testified that the value of the account was $50,000 on the date of marriage; (3) Knox's report

13

indicates that on March 26, 2018, Bryan transferred $26,871 out of this account to purchase the Kennedy Street residence, and this transfer consisted of $26,698.42 in separate funds and $172.58 in community funds. According to Knox's report, the entire cost of purchasing the Kennedy Street residence, borne by both Bryan and the community was $276,106.41. Simple arithmetic confirms that $26,698.42 is approximately 9.67% of $276,106.41.

However, Bryan's testimony that the E*Trade 5017 account contained $50,000 on the date of marriage was unsupported by any documentary evidence. *Cf. Osorno v. Osorno*, 76 S.W.3d 509, 512 (Tex. App.—Houston [14th Dist.] 2002, no pet.) ("[T]he only evidence as to the source of funds placed in those accounts was Henry's testimony; no deposit slips or bank records were offered tracing the money to support Henry's claim."). Although Knox did not directly testify concerning the value of this account on the date of marriage, he testified that he calculated the separate-property interest of the E*Trade 3901 account and "the other E*Trade account"—the context of which suggests he was referring to the E*Trade 5017 account—as that which was contained in the accounts on the date of marriage. And since Knox calculated the E*Trade 5017 account's separate-property interest as of June 30, 2021, as $50,793.43, we will begin by analyzing the tracing efforts using this figure as a starting point.

However, even accepting this $50,793.43 value as accurate, this leaves open the question of why the account only contained "$1,991.21 consisting solely of the separate funds of Bryan" after the $26,871 transfer. "Gaps in account statements can make tracing evidence less than 'clear and convincing.'" *Gopalan v. Marsh*, 706 S.W.3d 650, 680 (Tex. App.—Austin 2025, pet. filed) (quoting *Eichhorn*, 2022 WL 1591709, at *4). It is possible, of course, that what Knox meant to write is that the remaining $1,991.21 was the cash balance of the account but that the securities investments were left untouched by the transfer. This would presumably

14

mean that the account held $26,698.42 in cash on the date of marriage and $24,095.01 worth of various securities on the date of marriage. But Knox did not write this. Instead, he wrote, "The account was traced from January 1, 2017, through March 31, 2018. The account was invested in various publicly traded securities. . . . March 29, 2018 - $26,871.00 was transferred out for the purchase of 5725 Kennedy . . . The transfer represented $172.58 community funds and $26,698.42 separate funds of Bryan Miller. The balance in the account subsequent to the transfer was $1,991.21 consisting solely of the separate funds of Bryan Miller. The community funds were exhausted."

If the evidence indicating that the E*Trade 5017 account contained $50,793.43 on the date of marriage is accurate, then there was an unexplained withdrawal or depreciation in value of approximately $22,000 at some point during the marriage. *See Goyal*, 2021 WL 2149628, at *16 ("[T]he party attempting to prove that property is separate must present evidence showing the account balance when the separate property is deposited, the amount and character of withdrawals and deposits, and whether the balance during marriage ever fell below the value of the separate-property interest."). And the record does not support a conclusion that the E*Trade 5017 account contained any other amount on the date of marriage. While our review of the evidence is necessarily deferential, it does not allow us to play guesswork to fill in gaps in the record. *Cf. Jelinek v. Casas*, 328 S.W.3d 526, 538 (Tex. 2010) ("When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge."). Without knowing what happened to the funds contained in the account between the date of marriage and the date of the transfer, we cannot conclude that the separate property retained its character during that time. *See Kelly v. Kelly*, 634 S.W.3d 335, 356 (Tex. App.—Houston [1st Dist.] 2021, no pet.) ("Tom

15

essentially asks us to assume that, from the time the deposits were made in January 2013 until March 2018, when statements for the account appear in the record, the account only increased in value and never dipped below a $23,000 balance. Tom has not supplied us with clear and convincing evidence to justify this assumption."); *Snider v. Snider*, 613 S.W.2d 8, 10 (Tex. App.—Dallas 1981, no writ).

Additionally, there is no evidence to explain how or when the community's $172.58 interest in the account came about. Bryan testified that the only things added to the account were "capital gains." However, were that the case, the community should not have had any interest in the account whatsoever. *See Wadhwa v. Wadhwa*, No. 14-23-00521-CV, 2025 WL 2044632, at *13 (Tex. App.—Houston [14th Dist.] July 22, 2025, no pet. h.) ("Normally, capital distributions from a spouse's separate property are also that spouse's separate property." (collecting cases)). Additionally, Bryan's claim is contradicted by Knox's report indicating that shares of new stock were purchased during the marriage—after the transfer—using community funds.

For his part, Knox explained that, when evaluating the accounts, he recorded "[d]ividends, contributions, and interest income received after date of marriage . . . as community property." But that is a wide variety and does not help us in narrowing down what the $172.58—added to the account at an unknown date—could be. *See Flores v. Flores*, No. 14-00-00536-CV, 2001 WL 837527, at *2 (Tex. App.—Houston [14th Dist.] July 26, 2001, no pet.) (mem. op.) ("Though we all might justifiably conclude that 'obviously, something took place,' this amorphous conclusion does not supplant Jo Ann's legal burden to prove by clear and convincing evidence . . . that the . . . stock . . . was her separate property."). "One may plead that [an] account is separate property, but income earned and dividends paid—if not clearly traced—

16

will result in characterization of the account as community property due to commingling." *See Rivera v. Hernandez*, 441 S.W.3d 413, 423 (Tex. App.—El Paso 2014, pet. denied). Merely stating that $172.58 of the transfer was community property and $26,698.42 was separate property, without any attempt to trace those commingled funds to their origins, is nothing more than Knox's *ipse dixit*. *Cf. Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) ("[I]t is not so simply because 'an expert says it is so.'"); *Marvelli v. Alston*, 100 S.W.3d 460, 478 n.6 (Tex. App.—Fort Worth 2003, pet. denied) ("The term '*ipse dixit*' means 'something asserted but not proved' and is literally translated 'he himself said it.'"). And "[a]n *ipse dixit* is still an *ipse dixit* even if offered by the most trustworthy of sources." *Rogers v. Zanetti*, 518 S.W.3d 394, 409 (Tex. 2017).

Because the funds used to make a down payment on the Kennedy Street residence were not adequately traced, we conclude that the trial court mischaracterized the Kennedy Street residence as consisting of 9.67% Bryan's separate property. *See In re J.Y.O.*, 709 S.W.3d 485, 500 (Tex. 2024) ("[A]ccount funds not traced to either separate or community contributions are presumed to be community property.").

Additionally, we conclude that the trial court erred in characterizing the E*Trade 5017 account as Bryan's separate property. The trial court found that Bryan had a separate-property interest in this account in the amount of $50,793.43. Immediately following the $26,871 transfer, Knox noted that the account contained "$1,991.21 consisting solely of the separate funds of Bryan . . . . The community funds were exhausted." Only five days later, on March 31, 2018, the account contained $1,966.21 in cash, and over five hundred shares of publicly traded securities. Knox did not identify the value of these shares or state when they

17

were originally acquired. Nevertheless, Knox detailed that, on March 31, 2018, "the account had no community property."

Knox testified that his general tracing method was not to trace at all. Rather, he would look at the balance of the account at the date of marriage and the balance of the account as of June 30, 2021, and attribute any increase in the account to the community. But without evidence showing that the account never decreased below Bryan's separate-property interest, this method does not satisfy the clear-and-convincing evidentiary hurdle. *See Kelly*, 634 S.W.3d at 356.

And, indeed, Bryan's own evidence shows that the account decreased below this original $50,793.43 amount. First, there is the $26,871.00 transfer for the purchase of the Kennedy Street residence, which Knox said resulted in an account balance of "$1,991.21 consisting solely of the separate funds." And second, on the day of his testimony, Bryan stated that "5017 has two cents." A financial statement admitted into evidence confirmed that as of October 16, 2022, the E\*Trade 5017 account had two cents. Accordingly, we conclude that the trial court erred by finding that the E\*Trade 5017 account contained $50,793.43 in Bryan's separate property.

### b.     Hill Stable residence

The trial court found that Bryan enjoyed a 26.04% separate-property interest in the Hill Stable residence. In the light most favorable to the trial court, Bryan traced this interest as follows: (1) Bryan and Knox testified that Bryan purchased the Twine Drive residence on May 17, 2015, prior to the parties' marriage; (2) Knox's report indicates that Bryan sold the Twine Drive residence on August 30, 2019; (3) on September 3, 2019, according to

18

Knox's report, Bryan deposited the net proceeds from the sale of the Twine Drive residence—$89,159.34—into the E*Trade 9520 account; (4) according to Knox's report, on September 5, 2019, $68,996.35 of Bryan's separate property funds were wire transferred from this account to Concierge Title of Texas for the purchase of the Hill Stable property; and (5) following this transfer, the E*Trade 9520 account contained "$21,350.15 consisting of $1,608.15 community funds and $19,742.00 separate funds of Bryan."

Claudia did not dispute at trial that the Twine Drive residence was purchased prior to the marriage. We have previously stated that "[a] party's own testimony is sufficient to rebut the community property presumption if it is uncontroverted." *C.S.S.*, 2024 WL 4163557, at *5 (quoting *Bean*, 658 S.W.3d at 417). However, Claudia contends that because Bryan did not produce any documentary evidence to support his effort at tracing the funds from the sale of the Twine Drive residence to the purchase of the Hill Stable residence, his separate property claim necessarily must fail.

She compares this case to *Eichhorn*, in which we stated that "the clear-and-convincing-evidence standard requires documentary evidence tracing the separate nature of property." 2022 WL 1591709 at *3. But in that case, the expert who opined on the separate character of the account at issue relied entirely on appellee's statements concerning the account's activity. *Id.* at *7. We therefore concluded that the expert's report was "only a recasting of [appellee's] testimony on the topic." *Id.* Here, Knox's report states that he reviewed "monthly investment and retirement monthly [sic] statements from January 1, 2017, through June 30, 2021, and real estate documents related to purchases and sales of real property." "Litigants may trace separate property through documentary evidence, including bank or business records." *In re J.Y.O.*, 709 S.W.3d at 499. But expert testimony that relies on such

19

records or explains why such records are unnecessary in the formation of their opinion may also be sufficient for the purposes of tracing. *See Kelly*, 634 S.W.3d at 351–52; *cf. In re J.Y.O.*, 709 S.W.3d at 499 ("Expert testimony, including summaries or models, may establish account balances and allocate gains on invested contributions made before and during marriage."). The records themselves do not necessarily have to be admitted for the expert's opinion concerning those records to be credited. *See* Tex. R. Evid. 703; *Kelly*, 634 S.W.3d at 351–52.

And although the evidence concerning the E*Trade 9520 account also includes gaps and inconsistencies that render its separate property character questionable, these do not bear on the adequacy of tracing in this instance. The separate property funds used to purchase the Hill Stable property came from the sale of Bryan's separate property residence. The funds existed in a liquid state for approximately one week, and Knox accounted for their whereabouts at all times in his report. The clearinghouse method, which was discussed below, is a separate property tracing method which "presumes that when a spouse deposits separate property money into a commingled account, and makes a subsequent purchase of a similar amount from that same account, the purchased asset may be traced as separate property." *In re Marriage of Moore*, No. 12-22-00286-CV, 2023 WL 3369399, at *6 n.2 (Tex. App.—Tyler May 10, 2023, no pet.) (mem. op.) (citing *Peterson v. Peterson*, 595 S.W.2d 889, 892 (Tex. App.—Austin 1980, writ dism'd)). Under this tracing method, "[t]he amount withdrawn from the community-property account does not have to equal the amount of funds deposited to prove tracing under the clearinghouse method." *O'Connor*, 2025 WL 2147786, at *11; *see Sloan v. Sloan*, No. 02-23-00361-CV, 2024 WL4509728, at *9 (Tex. App.—Fort Worth Oct. 17, 2024, no pet.) (mem. op.) (where husband deposited $202,947.86 of his separate property into commingled account and later withdrew $184,486.75 to spend on real estate, $184,486.75 was

20

adequately traced as husband's separate property). Although the trial court did not specify the tracing method on which it relied to find Bryan had a separate-property interest in the Hill Stable residence, because Claudia "did not request additional findings asking the court to specify which tracing method it relied upon[,] we can rely upon any theory of tracing that is supported by the record." *See Sloan*, 2024 WL 4509728, at \*10 n.25.

Accordingly, we conclude that the trial court did not err by finding that Bryan possessed a 26.04% separate-property interest in the Hill Stable residence.

### c.     Thrift Savings Plan

Bryan's Thrift Savings Plan "includes contributions from his wages earned during marriage and, thus, the account is presumptively community property." *See In re J.Y.O.*, 709 S.W.3d at 499. Knox wrote that the plan "was traced from March 23, 2017, through September 30, 2021." Knox detailed the September 2021 balance of the Thrift Savings Plan, reporting that $52,124.99 was community and $29,317.20 was separate. Knox testified that he "assumed all assets" contained in the Thrift Savings Plan "at date of marriage were separate" and "the additions, through contributions and earnings, were community property."

However, he did not discuss when the plan began, what assets were held by the plan, or what the value of the plan was at any other point in time, either before or during the marriage. There were no financial statements introduced tracing the performance of the investments purchased during the marriage as compared with the investments purchased prior to marriage. Nor was there any testimony to this effect. Moreover, there is no evidence indicating whether the account ever dipped below its initial separate-property value. *See In re Marriage of Guerra*, No. 13-21-00377-CV, 2022 WL 16842086, at \*3 (Tex. App.—Corpus Christi–Edinburg

21

Nov. 10, 2022, pet. denied) (mem. op.) ("To adequately trace the assets in his retirement account, Rocky was required to provide clear evidence of the amount and character of each transaction affecting his Dell 401(k), as well as show whether the balance in his account dipped below the value of his separate property balance.").

Because Bryan did not adequately trace his separate-property interest in the Thrift Savings Plan, we conclude that the trial court erred in awarding Bryan $29,317.20 from it as his separate property.

### d.    E*Trade 3901 Account

Knox's report specified that he only traced this account "from January 1, 2017, through June 30, 2019." However, he concluded that the balance of this account on June 30, 2021, consisted of $40,146.25 in separate property, and $263.72 in community property. Knox confirmed that he reached this conclusion because those were "the account balances on the date of marriage" and no "money [was] put into that account after marriage."

Knox specified that "[i]nterest and dividends were recorded as community funds," and "[c]apital gain dividends were allocated between the community and separate units." However, Knox did not specify whether dividends and interest were reinvested or held as cash. Knox also did not detail whether the account ever decreased in value and, if so, how any depreciation affected his analysis. *See Kelly*, 634 S.W.3d at 351–52. And, indeed, a financial statement was admitted into evidence indicating that the value of the account on September 30, 2022, was $18,832.52. Accordingly, we conclude that the trial court erred in characterizing this account as consisting of $40,146.25 of Bryan's separate property.

22

### 3.    Harm

Having concluded that the trial court erred by characterizing the Kennedy Street residence, Thrift Savings Plan, and E*Trade accounts 5017 and 3901 as Bryan's separate property, we must next address whether Claudia was harmed by these mischaracterizations. *See DeSpain*, 704 S.W.3d at 870 n.2. Bryan contends that because Claudia failed to request findings of fact as to the values of these properties, we have no choice but to conclude that Claudia was not harmed. We disagree.

Here, the trial court expressed a clear intent to divide the community estate 65%–35% in Claudia's favor. Although the trial court did not assign a value to any of the assets, after awarding Bryan what it found to be his separate-property interest in them, it split the contested assets, awarding 65% to Claudia and 35% to Bryan. However, because the trial court erred in its calculation of Bryan's separate estate, this resulted in Bryan receiving, for instance, 44.67% of the Kennedy Street residence and Claudia receiving only 55.33% of it.[3] *See McElwee*, 911 S.W.2d at 190 (where trial court expressed intention to make "61%/39% division" of community estate but actually made "64%/36% division" based on mischaracterization of community property, mischaracterization was harmful error).

Additionally, in his proposed disposition of the issues, Bryan suggested that the community estate was worth $555,587.97. Claudia asserted that it was worth $794,873. Bryan asserted that the market value of the Kennedy Street property was $479,200, and Claudia suggested that it was worth $425,000. The evidence also indicated that the Thrift Savings Plan was worth $97,004.80 as of the date of trial and the value of the E*Trade 3901 account was

---

[3] The parties were ordered to sell the Kennedy Street residence and split the proceeds 65%–35% after the first 9.67% was set aside for Bryan.

hovering around $18,832.52. Given the relatively diminutive size of the community estate in comparison to the values of these assets, we agree with Claudia that the trial court's mischaracterization of these assets constitutes harmful error. *See id.*

However, we agree that Claudia cannot show she was harmed by the trial court's mischaracterization of E*Trade account 5017. The undisputed evidence at trial showed that this account contained two cents in it as of the date of trial. She also recommended in her proposed disposition of the issues that Bryan be awarded 100% of this account. Accordingly, we agree that the trial court's mischaracterization of this asset could not have had more than a *de minimis* effect on its division of property. *See id.* at 189.

In sum, we conclude that the trial court's mischaracterization of the Kennedy Street residence, the Thrift Savings Plan, and the E*Trade 3901 account as partially Bryan's separate property was harmful error. We therefore sustain Claudia's first issue in part and overrule it in part.

## B.    Child Support

By her second issue, Claudia contends that the trial court erred in its calculation of child support.

### 1.    Standard of Review & Applicable Law

"The Texas Family Code provides guidelines to trial courts in calculating monthly child support obligations and these guidelines are presumed reasonable." *Stringfellow v. Stringfellow*, 538 S.W.3d 116, 118 (Tex. App.—El Paso 2017, no pet.). "The starting point for assessing child support liability under the Texas Family Code is to calculate the child support obligor's monthly 'net resources' and apply statutory guidelines to that amount." *In re K.M.B.*,

24

606 S.W.3d 889, 894 (Tex. App.—Dallas 2020, no pet.). Courts may calculate net resources based on imprecise information. *Ayala v. Ayala*, 387 S.W.3d 721, 727 (Tex. App.—Houston [1st Dist.] 2011, no pet.). But "'[t]here must be some evidence of a substantive and probative character of net resources' in order for the trial court to discharge its duty under" the Family Code. *Miles v. Peacock*, 229 S.W.3d 384, 389 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (quoting *Newberry v. Bohn-Newberry*, 146 S.W.3d 233, 236 (Tex. App.—Houston [14th Dist.] 2004, no pet.)).

"Generally, we review the trial court's award of child support for an abuse of discretion." *In re A.L.S.*, 338 S.W.3d 59, 65 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). We apply the same hybrid analysis as discussed in Claudia's first issue; meaning, "sufficiency of the evidence is not an independent ground of error, but is a factor in assessing whether the trial court abused its discretion." *Id.*

### 2. Analysis

The Decree found that Bryan's net resources per month were $4,500, ordered him to pay $900 per month in child support, and found that "[t]he amount of child support ordered by the Court [is] in accordance with the percentage guidelines." Claudia contends that the trial court abused its discretion by calculating guideline child support based on a net monthly resource figure of $4,500. We agree.

Claudia suggests that there is no evidence to suggest that Bryan's net monthly resources are $4,500. In support of this argument, she relies on Bryan's proposed disposition of the issues, in which he represented that his gross monthly resources were $8,237.03 and his net monthly resources were $5,966.80. But this was not the only evidence before the court as to

Bryan's resources. The trial court also admitted into evidence Bryan's IRS 1040 tax return from 2021. According to this form, the total gross income Bryan received in 2021 was $89,357. This equates to a gross monthly income of approximately $7,446.41. In 2023, an individual grossing around $7,400 per month would receive a net monthly income of approximately $5,850.86. *See* Tex. Fam. Code § 154.061(b) (requiring Office of Attorney General (OAG) to promulgate tax charts to assist courts in establishing appropriate child support amounts); Office of the Attorney General, 2023 Tax Charts (2023), https://csapps.oag.texas.gov/system/files/2022-12/2023_Tax_Charts.pdf (last visited August 25, 2025); *see also Cervenka v. Cervenka*, 672 S.W.3d 814, 820 n.2 (Tex. App.—Corpus Christi–Edinburg 2023, no pet.) (court of appeals may take judicial notice of OAG's tax charts). At trial, Bryan testified that although he earns "115- per year," his monthly take-home pay was "only about 4,000 because [he] ha[d] to pay child support." At the time, per the trial court's temporary orders, Bryan was paying $1,192.25 in monthly child support. None of this evidence, even when viewed in the light most favorable to the trial court's judgment, supports a finding that Bryan's net monthly resources were $4,500.

Bryan suggests that Claudia's failure to request additional findings regarding the trial court's deviation from the child-support guidelines allows us to imply that the trial court determined that deviating from the guidelines was in the child's best interest. However, if a trial court deviates from guideline child support, it must specify its reasons for doing so in its order, even without a request for findings on the issue. *See* Tex. Fam. Code § 154.130 (entitled "Findings in Child Support Order"). And here, the trial court's findings express its explicit intent to conform its order to guideline child support, not to deviate from it. Specifically, the court found that the amount it ordered Bryan to pay is "pursuant to the guidelines set forth in the Texas Family Code" and "is in accordance with the percentage guidelines."

26

Therefore, because there is no evidence to suggest Bryan's net monthly resources are $4,500, we conclude that the trial court abused its discretion in calculating guideline child support based on this figure. *See Stringfellow*, 538 S.W.3d at 119; *Powell v. Powell*, 893 S.W.2d 161, 163 (Tex. App.—Houston [1st Dist.] 1995, no writ).

We sustain Claudia's second issue.

### III.    BRYAN'S CLAIMS ON APPEAL

Because sustaining the issues Bryan raises on appeal would not entitle him to any greater relief than that which he is already receiving by virtue of our remanding for a new trial on the division of community property, we need not address the issues Bryan raises on appeal.[4] *See* Tex. R. App. P. 47.1; *Bain & Schindele Tax Consulting, LLC v. EW Tax & Valuation Grp.*, No. 05-23-00560-CV, 2024 WL 3688124, at *5 (Tex. App.—Dallas Aug. 7, 2024, no pet.) (mem. op.) ("Because [cross-appellee's] remaining issues challenge the judgment, which we reverse, we need not address them."); *see also Larry F. Smith, Inc. v. The Weber Co.*, 110 S.W.3d 611, 616 (Tex. App.—Dallas 2003, pet. denied) (because trial judge was no longer on bench at time of appellate court's decision, appellate court could not abate for trial court to make findings of fact and conclusions of law and instead it "ha[d] no choice but to reverse the judgment in this case and remand the cause for further proceedings"); *Kelly*, 634 S.W.3d at 370

---

[4] The trial court's finding that Bryan abused the discovery process was part of its reasoning for granting Claudia's waste claim. Because we remand for a new trial on the just-and-right division of property, the trial court necessarily may revisit its determination of Claudia's waste claim on remand. *See Chu v. Hong*, 249 S.W.3d 441, 444–45 (Tex. 2008) ("[W]aste, fraudulent transfer, or other damage to community property are claims belonging to the community itself, so they must be included in the trial court's just-and-right division of community property upon divorce."); *Jacobs v. Jacobs*, 687 S.W.2d 731, 733 (Tex. 1985) ("It is, however, probably impossible to excise the reimbursement claims from the community division . . . .").

("Because we hold that the trial court committed reversible error with respect to characterizing portions of Tom's separate property as community property, an error which requires remand of the case to redivide the parties' marital estate, we vacate the award of attorney's fees to Sherry, which the trial court awarded 'to effect an equitable division' of the parties' estate.").

## IV. CONCLUSION

We reverse the portions of the trial court's Decree confirming the Kennedy Street residence, Thrift Savings Plan, and E*Trade 3901 account as Bryan's separate property. We reverse and remand the trial court's division of property for a new trial. *See Garza*, 217 S.W.3d at 549. We further reverse and remand the trial court's child support order. We affirm the trial court's separate property findings concerning the Hill Stable residence and the E*Trade 5017 account. The remainder of the Decree was not challenged on appeal and thus has become final and non-appealable.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Triana and Ellis

Affirmed in Part, Reversed and Remanded in Part.

Filed: August 27, 2025